ALL-YEAR GOLF, INC., Respondent, v. PRODUCTS INVESTORS CORPORATION, LTD., Appellant.

Fourth Department, May 14, 1970.

*Crystal, Manes & Rifken (Bernard Samuels* of counsel), for appellant.

*Angelo Pettrone* for respondent.

MARSH, J. This is an appeal by defendant from a judgment which awarded plaintiff $25,000 after a nonjury trial upon its cause of action for the return of a down payment on a sales contract with defendant for 20 electronic Golfomat units which it had purchased for use in an indoor computerized golf center. The defendant counterclaimed for plaintiff's breach of the sales contract seeking the profit it would have received had the sale been consummated.

Dominick Falcone, his brother Anthony, and other investors, negotiated with defendant Products Investors Corp. Ltd., in December of 1965 for the purchase of 20 Golfomat units. These negotiations were confirmed in a letter of December 18, 1965. Defendant seller stated in the letter that it would rush completion of the units for delivery to the site by January 15. Enclosed were copies of a dealership agreement and sales con-

248

tract which seller requested be signed and a copy returned. This was not done and the vice-president in charge of sales came to Syracuse from New York to expedite execution of the contract. The contract was signed by Dominick Falcone as acting president of plaintiff corporation, All-Year Golf Inc. The sale contract for the 20 Golfomat units provided for a total sale price of $125,000 and for installation at Kasson Road and Route 5, Camillus, New York. The units were to be completely paid for within 90 days after delivery. Typed in was a clause " This agreement is subject to obtaining suitable lease at Camillus, New York." Executed at the same time was an exhibitor agreement making plaintiff All-Year Golf Inc. exclusive distributors of defendant's Golfomat units for Western New York State. This agreement was contingent on plaintiff's taking 20 units and also subject to obtaining a suitable lease at Camillus. Plaintiff was to get a commission on all sales of Golfomat units within its territory subsequent to December 18, 1965.

In a letter dated January 12, 1966, defendant's president, Robert Hopp, requested plaintiff to delete the condition that the agreement would become effective only if a suitable lease in Camillus was obtained. Plaintiff's president Dominick Falcone testified that he called Mr. Hopson, defendant's vice-president, as soon as he received the letter informing him that plaintiff would not go along with a deletion of the Camillus condition. A lease was negotiated with the P & C Food chain but a zoning change was denied by the Camillus Town Planning Commission.

On February 18, 1966, defendant wrote Anthony Falcone complaining that it was losing sales in the Western New York area because it had not obtained a showcase in Syracuse for its Golfomat units to demonstrate to prospective buyers. Defendant wanted to get the program going or terminate it and requested the $15,000 remaining on the $25,000 down payment. Anthony Falcone wrote defendant on February 25, enclosing a $15,000 check, stating that plaintiff was trying to go ahead with an airport building and would be needing one of defendant's men to lay it out. Mr. Hopson agreed over the phone to go along with the airport site, owned by the City of Syracuse Aviation Commission, instead of the Camillus site. Mr. Hopp came early in March and met John Homik, a public accountant and one of the plaintiff's stockholders. Homik took Hopp to the airport building and Hopp looked it over and appraised it for the installation of Golfomatic units. Hopp then sent an architect to the airport site to lay it out. In the first part of April a letter was received from the Airport Authority denying

the application for a lease and Dominick Falcone notified Hopson of this by telephone with the request that defendant return the down payment, but Hopson suggested plaintiff continue to look for another lease. In a letter dated April 27 from defendant's president Hopp to Dominick Falcone, Hopp requested that since the airport deal had fallen through, plaintiff take delivery of the 20 Golfomat units and store them in a warehouse. In response Dominick Falcone called Hopp stating that plaintiff had no place for the units and was not responsible for them until it had obtained a lease.

Shortly after the loss of the airport site lease Hopp suggested that plaintiff build its own building. The stockholders of plaintiff got together on June 3 with the idea of building their own building and decided against it. Hopp came to Syracuse the latter part of July and looked over certain sites north of Syracuse and in the Town of Cicero with the idea of defendant erecting a building and leasing it to plaintiff. In a letter dated August 15, 1966, Hopp outlined a proposal to build a building and lease it to plaintiff for the operation of the Golfomat units. In a letter dated August 12, 1966, defendant spelled out its offer to build and lease to the plaintiff. It suggested the plaintiff get an investment group down to manageable size so they could reach a decision without consultation with so many people since some of the members had lost interest and withdrawn. Defendant said it would keep its offer open to build a building and lease it to plaintiff until September 15, 1966. In a letter dated September 1, 1966, defendant wanted to know if the four original stockholders wanted to go ahead on their own and if so it would provide a manager to run the center.

The court below in its decision found that plaintiff waived the condition that the sales contract for the 20 units could not go into effect until a suitable lease had been obtained in the Town of Camillus. This waiver, the court held, was demonstrated by the course of its conduct in attempting to obtain a lease at the airport site and actively soliciting and obtaining the help of defendant and its architect concerning such. After the airport deal fell through, however, the court concluded that plaintiff retracted its waiver within the meaning of subdivision (5) of section 2–209 of the Uniform Commercial Code.

It would appear clear that there was reliance upon plaintiff's waiver of the Camillus condition. Anthony Falcone notified Hopp that plaintiff was going ahead with the airport site and sent the $15,000 remaining on the down payment. This was some 20 days before defendant alleged it had completed manufacture of the Golfomat units. Defendant then went ahead and

made several site inspections and personal trips to Syracuse and sent its architect in to study the layout and work up a floor plan. These activities were all taken in reliance upon plaintiff's decision to look elsewhere after the zoning change was denied for the P & C building. In addition plaintiff had a distributorship contract with the same clause which gave it exclusive distribution rights for all of Western New York and plaintiff was to set up a showcase center for promotion of the units within its territory. By failing properly to terminate its contractual arrangements when the Camillus lease fell through it led defendant not to attempt to find someone else for such distribution rights and promotional showcase. Reliance upon the waiver and change in position in consequence thereof can clearly be found in the record.

The waiver found by the court, however, seems overly broad and not justified by the case law. Subdivisions (2) and (4) of section 2–209 of the Uniform Commercial Code provide:

" (2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded ". * * *

" (4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver."

The practice commentary (McKinney's Cons. Laws of N. Y., Book 62½) by Buerger and O'Connor states:

" Subsections (3), (4) and (5) of this section [§ 2–209] are self-explanatory and do not appear to change prior law." A written agreement which provides that it cannot be modified except by a writing signed by both parties to the agreement can be changed by a course of actual performance. Part performance which is said to be taken in consequence of an oral understanding which modifies one of the terms of the agreement will not be construed to so modify unless it is unequivocally referable to such new understanding. (*Bakhshandeh* v. *American Cyanamid Co.*, 9 A D 2d 35, affd. 8 N Y 2d 981; *Bright Radio Labs.* v. *Coastal Commercial Corp.*, 4 A D 2d 491, affd. 4 N Y 2d 1021.)

The fact that plaintiff and defendant mutually agreed to look elsewhere and actually did look elsewhere than the P & C Camillus site for a lease meets the above test. Their conduct with respect to the negotiations on the airport lease is unequivocally referable to their understanding not to limit the site location to the P & C building in the Town of Camillus. No conduct, however, on the part of either party unequivocally refers to a decision to waive the condition precedent to plain-

tiff's obligation to accept the 20 units that a suitable lease be actually obtained before delivery and obligation to accept and pay for such units took place. Modification by performance was effective only to eliminate the Town of Camillus from the condition and was not effective to eliminate the condition that a suitable lease be obtained.

Implicit in the arrangements was an obligation that plaintiff make reasonable efforts to obtain a suitable lease for installation of the Golfomat units. A duty to make such reasonable efforts would be implied from the distributorship arrangement and the exclusive territory granted by the original contract within which it alone would be allowed to construct Golfomat centers in Onondaga County. Where rights and privileges are conferred a duty will be implied to take reasonable efforts to bring about the exercise of such rights. *Wood* v. *Duff-Gordon* (222 N. Y. 88, 91): "The defendant gave an *exclusive* privilege. She was to have no right for at least a year to place her own indorsements or market her own designs except through the agency of the plaintiff. The acceptance of the exclusive agency was an assumption of its duties".

Where no time period was set within which the plaintiff must make reasonable efforts to obtain a suitable lease a reasonable time will be implied. (*Van Iderstine Co.* v. *Barnet Leather Co.*, 242 N. Y. 425, 430.) Conduct of the parties also would be looked to in determining what limit they themselves had placed upon the reasonable time limitation. (*Van Iderstine Co.* v. *Barnet Leather Co., supra*, pp. 430–431.) By the end of May the parties had ceased looking for a lease. At this time defendant was suggesting that the plaintiff construct its own building to house the Golfomat center which idea the corporation stockholders rejected at the June 3 meeting. Subsequent negotiations appear to have dealt with the idea of reducing the size of the investment group and going ahead with an entirely new scheme. This would involve the idea of the defendant building the building and leasing it to a group consisting of the four officers of plaintiff, Dominick Falcone, Jr., Anthony T. Falcone, George Gelsomin and Benjamin Laurette. The later negotiations were not unequivocally referable to the defendant's contract with plaintiff and in any case they contemplated a radically different arrangement which would surely have meant a re-negotiated contract. Both sides ceased looking for a new lease site sometime between April and June, 1966 and thus put a practical limitation upon the implied reasonable time limitation within which plaintiff had to make reasonable efforts to obtain a lease for the Golfomat center.

No suitable lease outside of the Town of Camillus having been obtained, no waiver of the condition of the contract by subsequent performance can be found which would render the plaintiff liable to the defendant under the contract.

The judgment should be affirmed.

DEL VECCHIO, J. P., GABRIELLI, MOULE and BASTOW, JJ., concur.

Judgment unanimously affirmed with costs.