**William WOLFF and Wolff Motor Company, Inc., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Ford Marketing Corporation and Ford Leasing Development Company, Defendants.**

**No. 75 Civ. 3390 (WCC).**

United States District Court,
S. D. New York.

May 12, 1980.

Daniel Rosen, New York City, for plaintiffs.

Hughes, Hubbard & Reed, New York City, for defendants; John A. Donovan, Otis Pratt Pearsall, Ronald J. Tabak, Jacqueline D. Gilbert, New York City, William A. Zolbert, Ford Motor Company, Dearborn, Mich., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This case is before the Court for decision following a three-day trial held on November 5–7, 1979. In light of this Court's previous grants of summary judgment with respect to plaintiffs' antitrust claims, common law fraud claims, and certain contract claims, see this Court's opinions of April 18, 1977, November 21, 1977 and May 10, 1979,

and of the parties' stipulated dismissal of those counts in the complaint relating to alleged warranties by defendants, see stipulations of February 14, 1979 and March 2, 1979, the issues before the Court have been narrowed to plaintiffs' claims in Counts IV and V of the Second Amended Complaint that defendants either breached or are estopped from denying breach of a Buy/Sell Agreement dated December 17, 1974 between plaintiff Wolff Motor Company, Inc. ("Wolff Motor Company," "Wolff Motors" or "WMC") and defendant Ford Marketing Corporation ("Ford Marketing"),[1] and a Lease Agreement dated December 9, 1979 between Ford Leasing Development Company ("LeaseCo") and plaintiff William Wolff ("William Wolff" or "Wolff").

The issues in the case have been limited still further by plaintiff Wolff Motors' execution, subsequent to trial, as part of a resale of its assets to Ford Motor Company ("Ford"), of a release which by its terms covers these claims against these defendants. Presently pending, then, are plaintiff William Wolff's individual claims against these defendants.

This Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

### I. Background

The claims here arise out of an aborted arrangement in 1974 under which ownership of the Wolff Motors Ford dealership on Coney Island Avenue in Brooklyn was to be transferred, first back to Ford through its subsidiary Ford Marketing by means of the Buy/Sell Agreement described above, and then to new owners. Under this arrangement, William Wolff individually was to continue to own the property on which the dealership was located, and was to receive rental payments for the use of that property pursuant to a Lease Agreement with LeaseCo, another Ford subsidiary, which would in turn receive rental payments from the new dealership (with LeaseCo thus acting, in effect, as a deep-pocket guarantor

---

1. The parties have treated Ford, Ford Marketing and LeaseCo as one entity for purposes of liability on these agreements and the Court will do the same.

for William Wolff). No replacement dealer was found in that year, however, and the transactions contemplated by the two agreements were never consummated.

With respect to plaintiffs' claims for breach of the two agreements, defendants contend that a condition precedent to the Buy/Sell Agreement was that Ford secure a suitable replacement dealer who would repurchase the dealership from Ford Marketing Corporation; that this condition was never satisfied; and that, as a result, the Buy/Sell Agreement never took effect and defendants cannot be held to be in breach of that agreement. Defendants further assert that LeaseCo's performance under the Lease Agreement with William Wolff was expressly conditioned on the closing of the transactions contemplated in the Buy/Sell Agreement, so that Wolff cannot assert a breach of contract claim under the Lease Agreement if the condition precedent to that agreement, closing on the Buy/Sell Agreement, never occurred.

Plaintiffs assert, however, that Ford frustrated the performance of the condition precedent in the Buy/Sell Agreement by refusing to accept either the replacement dealership of Patrick Kieran ("Kieran") and Robert Moleti ("Moleti") acting jointly as Action Ford, Inc. ("Action Ford"), or any of the other dealer prospects available during 1974 and 1975; and that this frustration of satisfaction of the condition precedent to the Buy/Sell Agreement, which, in turn, frustrated the satisfaction of the condition precedent to the Lease Agreement, precludes defendants from relying on these unsatisfied conditions as a defense under cases such as *Kooleraire Service and Installation Corporation v. Board of Education*, 28 N.Y.2d 101, 320 N.Y.S.2d 46, 268 N.E.2d 782 (1971). Plaintiffs further contend that defendants are equitably estopped from denying their obligations under the two agreements, based on defendants' encouragement of or acquiescence in certain steps taken to replace Wolff Motors' licensing, signs and other indicia of ownership with corresponding Action Ford licensing, signs, etc.

## II. Discussion

The Court notes initially that it is unclear whether William Wolff may press a breach of contract claim in the absence of such a claim by Wolff Motors, since Wolff was not a party to the December 17, 1974 Buy/Sell Agreement, and since the Lease Agreement, to which Wolff is a party, is expressly made effective only upon the closing of the arrangements outlined in the Buy/Sell Agreement, Exhibit 41 at 1,[2] which closing Wolff concedes never occurred.

Even if Wolff is considered to have standing to raise the frustration of the condition precedent to the Buy/Sell Agreement, to which he was not a party, as a proximate cause of the breach of the Lease Agreement, to which he was a party, however, the Court concludes that defendants are not liable under either agreement.

### A. Contract Claims

Plaintiffs' breach of contract claims turn on the interpretation of the following term in the Buy/Sell Agreement:

> "12. *Conditions Precedent to Payment of Purchase Price* Payment of the various sums stated in this Agreement shall be conditioned . . . upon accomplishment of the following conditions precedent . . . :
>
> (a)
>
> \* \* \* \* \* \*
>
> (vii) *Successor Dealer*—Buyer [Ford] shall have secured a replacement dealer to take over the dealership immediately following the Closing." Exh. 42 at 12(a)(vii).

Defendants contend that this term should be construed to mean a replacement dealer satisfactory to Ford. Plaintiffs argue that the term should be read to mean any replacement dealer, or at least, any of those

---

**2.** The agreement provides:

"This Lease shall be for a term commencing on the *later* of (a) the 30th day following the date of this Lease, or (b) the first day following the closing of the transactions contemplated in the Buy/Sell Agreement . . . ." (emphasis added).

dealer prospects available to Ford as of January 9, 1975, the inventory date prior to the scheduled closing date of January 15, 1975.

1. Testimony at trial

a) Negotiations with Action Ford

The parties have stipulated, Statement of Agreed Facts, ¶ 20, and the testimony at trial confirms, see, e. g., Trial Transcript ("Tr.") at 152, 305, that both the Buy/Sell Agreement and the Lease Agreement were negotiated under the assumption by all the parties to this suit that the Wolff Motors dealership would be taken over by Kieran and Moleti's Action Ford. Although the Action Ford deal had come close to falling apart on several occasions, see Tr. at 97, 158, 320, so that the closing date mentioned in the Buy/Sell Agreement had been rescheduled several times, at 146, 391, on January 9, 1975, the inventory date prior to the scheduled Buy/Sell closing date of January 10 and new franchise closing date of January 15, 1975, both Wolff and the responsible Ford representatives expected that the entire deal would finally be struck and that the Buy/Sell Agreement, representing the portion of the deal between Wolff Motors and Ford, would at last be signed, thus triggering LeaseCo's obligations to William Wolff under the Lease Agreement.

There is, further, no conflict in the testimony as to the terms under which defendant Ford intended to grant a franchise to the prospective new dealership, Action Ford, at their January 15, 1975 closing date.[3] After somewhat lengthy negotiations among the two Action Ford participants, Kieran and Moleti, and the various levels of the Ford Hierarchy, see Tr. at 140–44, 172–78, 335–37, Kieran, the dealer with cash but with no "front end" new car sales experience, had agreed to provide 75% of the down payment for the new dealership, while Moleti, the dealer with sales

experience but little capital or business management experience, had agreed to come forward with $41,250, representing 25% of the down payment, raised from a second mortgage on his house and a gift from his mother-in-law, see Tr. at 291, 347–48, 353; Exh. 25; Statement of Agreed Facts, ¶ 13. Ford had, in turn, agreed that this arrangement would satisfy its requirements that each prospective dealer have a substantial stake in the new franchise, Tr. at 574–79.

b) The Inventory Date

There was conflicting testimony as to what happened on January 9, 1975, the inventory date prior to the Buy/Sell closing date scheduled for January 10 and the January 15 closing date scheduled for the transfer of the dealership to Action Ford.

As William Wolff described the events of that day, Ross Roberts ("Roberts"), the Ford representative responsible for arranging and approving dealer replacements at the district level, arrived early to take an inventory in preparation for the closing, while Kieran arrived somewhat later, Tr. at 48–49. Roberts indicated to Wolff that he had the check for Wolff in payment for the transfer of assets contemplated under the Buy/Sell Agreement. Some time later, Moleti came in and asked to speak privately with Roberts. Roberts and Moleti went outside, returned, and asked Wolff to leave his office; Wolff went down to the showroom floor. An hour later, Roberts, Moleti and Kieran emerged from Wolff's office and told Wolff the deal would not go through because Moleti did not have the money for his portion of the down payment. Tr. at 51. Wolff further testified that he then heard Kieran offer to take the dealership by himself and put up all the money, and that Roberts turned that down; that

---

**3.** Wolff testified that he was unaware of the terms of the planned Action Ford franchise investment, Tr. at 95, 130. Ross Roberts, however, testified that Wolff was well aware of each stage in the development of the terms upon which the Kieran-Moleti franchise was negotiated as well as of the terms as finally approved, Tr. at 286, 345–46, 353, 368.

The Court notes that Wolff's knowledge of the terms of the deal is not material to his contract claim under the Court's interpretation that the replacement dealer provision must be measured by objective industry-wide standards, rather than according to the understanding of Wolff alone.

Kieran offered to put up the money for Moleti and that that was turned down; and that Bill Jones ("Jones"), Wolff's general sales manager, offered to take Moleti's place in the proposed dealership, and that Roberts said that he would have to get back to Wolff and Jones on that one. Tr. 52–54.

Kieran testified to substantially the same sequence of events up to the time Roberts returned from his private conversation with Moleti. At that point, Kieran testified, he offered to put up all the money himself or to lend Moleti his share, and Roberts initially responded by saying that he could probably work something out with Detroit; but returned after making a phone call saying that Detroit would not accept either proposal, Tr. at 159–61. Kieran further testified that he never offered to lend Moleti money in an under-the-table way (*i. e.*, without informing Roberts or Roberts' superiors at Ford), but that he did further offer to *give* Moleti the money "[b]ecause at that time I had invested a lot of money in the place, and I felt it was a good deal," Tr. at 163, and that that offer was not acceptable to Ford either, Tr. at 163. Finally, Kieran testified that the substance of these offers was repeated to Wolff on the showroom floor, and that Wolff eventually "got mad" and threw them all out of the dealership offices.

Roberts testified that, on the morning of the 9th, when Kieran and Moleti arrived at Wolff Motors, each asked to talk to Roberts privately. Roberts went first with Moleti to his car, where Moleti initially stated that Kieran did not want to go forward with the deal, and then admitted that he had spent approximately $21,000 of the $41,500 he was supposed to come up with to close the deal, but still had $20,000, and hoped to close the deal on the basis of Kieran's loan to him of the rest of his required contribution.

Roberts further testified that he then talked to Kieran alone. Kieran indicated that, on the previous evening, Moleti had informed Kieran and McMasters, the Action Ford attorney, that he was unable to come up with the agreed-upon amount of his down payment; and that Moleti had then proposed an under-the-table deal in which Kieran would lend the down-payment mon-

ey to Moleti without the knowledge of Ford. Kieran then indicated to Roberts that Kieran wanted Roberts to approve of the arrangement; as Roberts recalled, Kieran stated that "[then] we'll go ahead and do it and Ford Motor Company or no one else will ever know about it, just you and I and Moleti." Tr. at 307.

Roberts next testified that, at that point, he requested that Kieran and Moleti call in McMasters to resolve the discrepancies between the explanations given by Kieran and Moleti, and that McMasters, when he arrived, confirmed that Kieran's story was true. Roberts rejected the under-the-table proposal, Tr. at 310, and asked the parties if they had any further suggestions as to how the deal might be salvaged. Moleti then indicated that the maximum investment he was prepared to come up with was $9,000 and McMasters indicated, in response to Roberts' question, that his clients could not close the deal as originally planned. Tr. at 311–12.

Finally, Roberts testified, Kieran proposed a dealership comprised of himself and Bill Jones, and Roberts told Kieran, and later, Jones himself, that he would consider it, although, in light of Ford's previous consideration and rejection of Jones as a replacement dealer based on Jones' long-term association with Wolff, whose sales record had not been entirely satisfactory, Roberts "knew that we weren't going to accept" that proposal. Tr. at 315.

c) Other dealers considered

Following the breakdown of the Action Ford deal, the testimony indicates that Ford considered, but rejected, the following replacement dealer proposals: Kieran alone; Kieran and Bill Jones; Kieran and Milt Dobkin; Kieran and a Mr. Weiss from Volkswagen; Kieran and certain other Ford dealer employees.

As to the suitability of Kieran alone as a replacement dealer for Wolff, plaintiffs stressed Ford's glowing evaluation of Kieran's prior business experience in auto body work and in selling used cars, and Kieran's subsequent success as a suburban Chevrolet

and Dodge dealer. Defendants' witnesses testified, however, that for a "point"[4] the size of Wolff Motors in Brooklyn, they were looking for a dealer or a dealer combination with some experience in selling new cars, and that Kieran alone did not satisfy this requirement. Tr. at 284, 568, 576–77.

As to the proposed team of Kieran and Bill Jones, which was suggested, despite Ford's previous rejection of Jones as the sole replacement dealer, William Wolff indicated a belief that Jones had been deemed unacceptable to Ford on both occasions due to Jones' history of a heart condition, Tr. at 53–55. Kieran testified that Ford had indicated that a Kieran-Jones combination would be acceptable provided that Wolff would lease his property directly to Kieran-Jones (rather than using LeaseCo as a guarantor of the rental payments), Tr. at 164–65. Roberts specifically denied those assertions by Kieran, and testified that Jones had been rejected as a sole dealer and rejected as a partner for Kieran due solely to Jones' association, as general sales manager, with the poor sales performance of Wolff Motors, Tr. at 315–17. John Knight ("Knight"), Ford's dealer franchising manager for the eastern United States, testified that he had concurred informally with Roberts' rejection of Jones for the same reasons, although Jones was never formally proposed to Knight at the national level, Tr. at 567–80.

Kieran testified that he had proposed Dobkin, a former partner in another Ford dealership, as a co-dealer, but further indicated on cross-examination that, although he did not currently remember the circumstances of his meeting with Dobkin, he had stated at his deposition that he and Dobkin did not team up because Dobkin did not think they would make good partners, Tr. at 194–96. Roberts testified that, as he recalled it, Kieran had rejected Dobkin as a partner, Tr. at 418.

Kieran indicated that he had proposed a Mr. Weiss from Volkswagen, and that Weiss was unacceptable to Ford, Tr. at 164. Defendants introduced no evidence as to Weiss, but defendants' witnesses Roberts and Knight testified that they were looking for a person to team up with Kieran who could complement Kieran's parts, used car and business management background with new car sales expertise and experience in the way *Ford* handled new car sales and credit arrangements.

Wolff testified that he believed that Ford had entertained an application from the sales manager of Universal Ford to replace Wolff as dealer, but that Ford could not consider that application because the applicant had not obtained a letter of permission from his dealer-employer, Tr. at 56. Roberts confirmed that Ford would not consider applications from employees of existing Ford dealerships without a letter of permission from the employing dealer, Tr. at 415, 439.

## 2. Interpretation of the Contracts

The Court first concludes that the phrase "a replacement dealer" in Paragraph 12(a)(vii) of the Buy/Sell Agreement of December 17, 1974 is sufficiently ambiguous to permit the Court to consider parol evidence with respect to the intended meaning of the term. See *e. g., Mister Filters v. Weber Environmental Systems*, 44 A.D.2d 639, 353 N.Y.S.2d 835, 837 (3d Dept. 1974).

The Court next finds that the evidence shows that, as per Exhibit 40, the letter of assurances sent to Wolff after the November 19 meeting of the interested parties, the parties contemplated that the replacement dealer would be Action Ford; and concludes that, during the period from December 17, 1974 to January 9, 1975, Ford did accept Action Ford as a replacement dealer and did not frustrate satisfaction of the conditions precedent.

The Court further finds that the parties had reached no agreement as to the meaning of the term under the circumstances which actually developed on January 9, *i. e.*, the breakdown of the Action Ford arrangements as accepted by Ford. The Court will, however, imply an agreement that, under such circumstances, the term "replacement

---

**4.** That is, dealership.

dealer" means "reasonable replacement dealer" in light of auto industry standards for dealership qualifications for a point such as Wolff Motors. See, e. g., *All-Year Golf, Inc. v. Products Investors Corp.*, 34 A.D.2d 246, 310 N.Y.S.2d 881, 885–86 (4th Dept.1970). Under such a standard, the Court concludes that Ford justifiably rejected the dealer prospects available as of January 9, 1975, as well as those available in the months subsequent to that date and prior to the filing of plaintiffs' lawsuit, so that Ford did not, as plaintiffs allege, frustrate satisfaction of the conditions precedent to the Buy/Sell Agreement and the Lease Agreement at any time.

a. Action Ford

The Court finds that Roberts, representing Ford management, had ample reason to reject the Kieran-Moleti/Action Ford package as of January 9, 1975. The Court credits Roberts' testimony that, on that morning, after Moleti had informed Roberts that he could not come up with the money, Kieran made no further suggestions other than to relay the under-the-table loan proposal to Roberts: Roberts' version of the events of that day is the most complete, and his explanation of the parties' behavior appears to be the most plausible in light of Ford's obvious interest in securing a replacement dealer to improve its sales in Brooklyn, satisfy its obligations under the Buy/Sell Agreement with Wolff, and avoid an already threatened lawsuit by Wolff. Furthermore, Roberts lacks Kieran's direct interest in the outcome of this litigation, since Kieran is currently pressing a similar claim against Ford based on these events; and Roberts presented his testimony clearly and without hesitation, while Kieran's answers often appeared less than forthright, if not evasive.

The Court concludes that Roberts justifiably rejected the under-the-table loan suggestion as fraudulent and inconsistent with the requirements of Roberts' position as a representative of Ford. The Court further concludes that Roberts reasonably determined as of January 9 to have no further business discussions with Moleti: the Court agrees with Roberts' assessment that "I had reason to doubt anything [further which Moleti said] in the fact that he had gone from [a proposed investment of $40,000] to 20 to 9 in that morning," Tr. at 294, and finds it reasonable that Roberts had no further confidence that Moleti would make a good dealer, see Tr. at 398.

Furthermore, even if the Court were to credit Kieran and Wolff's testimony that Kieran had proposed, not an under-the-table loan arrangement with Moleti, but a straight loan or gift of the necessary funds to Moleti, and even if Roberts had not at that point been justified in rejecting the Kieran-Moleti package on grounds of the apparent unreliability of Moleti as an investor, the Court concludes that Ford's rejection of the Kieran offers would have been reasonable under industry standards. The terms under which Ford approved the Kieran-Moleti dealership—a 75% investment by Kieran and a 25% investment by Moleti— were, admittedly, more stringent with respect to Moleti's required investment that was the original 90–10% recommendation made by Roberts, at the district level, to the regional level in New Jersey, see Tr. at 140–44, 296, 339.[5] Even under the higher, approved package, however, Moleti's investment in the dealership was, by industry standards, minimal. Roberts, the district representative, and Knight, who was charged at the national level with giving final approval to packages recommended up through the district and regional levels, testified that Ford's normal policy was to look for a single dealer with both sales experience and capital; and that when, as in the case of Kieran and Moleti, they considered combining prospective dealers in order to gain both attributes for the dealership, they normally required the experienced investor—in this case, Moleti—to put up 51% of the down payment and own 51% of the dealership shares. Roberts and Knight further testified that they only considered a

---

5. The chain of command was that the district level would recommend proposed dealerships to the region, which then forwarded proposals which it found acceptable to Detroit (Knight's level) for final approval. Tr. at 344.

75–25% investment ratio for Kieran and Moleti's proposed acquisition of a dealership of the size and regional importance of Wolff Motors because it was generally very difficult to attract dealer prospects to the Brooklyn market, Tr. at 364–65, 569–70, and because Ford faced the threat of litigation by Wolff, Tr. at 364.

As to the required source of the funds, Knight and Roberts both testified as to the importance Ford placed on tying each prospective dealer to the deal by means of a commitment of his own funds or funds from immediate family members; Knight explained that, in Ford's opinion, a gift of such a sum by any other person was inherently improbable (and would appear, rather to be some sort of under-the-table loan), Tr. at 579, and a loan from any other source would be something from which an unhappy dealer might walk away without compunction.

The testimony of defendants' expert witness from the Chevrolet Division of General Motors, William C. Clark ("Clark"), moreover, indicates that the Ford standards are comparable to those applied at Chevrolet. Clark testified that, if a dealership was to be comprised of two or more dealers, Chevrolet preferred that one dealer put up 51% of the investment and the other, 49%. If the ratio was to be weighted more heavily in favor of investment by one dealer, the second dealer would be required to put up a minimum of 25%, Tr. at 633–34, 639–40. In addition, Clark testified, to ensure that each dealer would feel obligated to devote his full efforts to the business, Chevrolet required that the money invested come either from the prospective dealer directly or from a direct gift of cash from the dealer's immediate family with a letter from that family member certifying that the gift came with no strings attached. If possible, Chevrolet further suggested that any dealer with less than a 49% share of the dealership also be given an option to purchase up to 49% of the business, Tr. at 641. Finally, Clark testified that Chevrolet was strict in adhering to these requirements: he indicated that at one point he had arranged personally to acquire a dealership, but was turned down when he secured a portion of the money from a friend rather than from the planned unconditional gift from his father, even though, at that time, he had worked for Chevrolet for twenty-six years; and that, as a general matter, as a Chevrolet executive charged with approving dealership acquisitions, he would never have approved a deal based on a gift from anyone other than a relative "because, as was mentioned, really, you [do] not find strangers giving each other 10, 20, 30, $40,000." Tr. at 645. Under these standards, neither of the Kieran proposals—to lend Moleti the investment money or to give it to him— made the Kieran-Moleti package reasonably acceptable to Ford.

### b. Kieran alone

The Court next concludes that it was not unreasonable for Ford to reject Kieran acting alone as a replacement dealer for the Wolff Motors dealership. Kieran admittedly had not at that time had any new car sales experience. The Court notes that Kieran's subsequent success in suburban dealerships is not of great probative value in reference to Kieran's earlier qualifications to become the sole dealer at a large urban dealership, and that not only the Ford management, but also defendants' expert witness Clark indicated that a dealer with no new car sales experience would be unacceptable as sole dealer in a point such as Wolff Motors, see Tr. at 639.

### c. Kieran-Bill Jones

Thirdly, the Court concludes that Ford's rejection of a Kieran-Bill Jones package was not unreasonable. Wolff admits, Tr. at 66, Kieran was aware, Tr. at 194, and Roberts stressed strongly, Tr. at 268–70, that Ford had not been happy with the overall sales performance of Wolff Motors. Jones, who had worked at Wolff Motors for ten years as the person in charge of new and used car sales, Tr. at 54, 278, was an integral part of that performance, Tr. at 279. Roberts' judgment that "there is no reason to make a replacement if . . . we are going to be just as bad off as we were, and we hadn't improved ourselves," Tr. at 317,

is a reasonable one, and on these facts, it was not unreasonable for Roberts to conclude that with Jones as sole dealer or with Jones as Kieran's front-end man, the dealership's sales performance was not likely to improve.

Nor is Ford estopped from refusing to accept a Kieran-Jones package by Roberts' failure to immediately reject Jones' application when Kieran proposed Jones and Jones subsequently proposed himself as Kieran's partner after the Kieran-Moleti deal had fallen through on January 9. As Roberts explained, after watching the deal he had worked on for some time fall apart literally without warning, he was angry and in no condition to deal tactfully with Jones' proposal, see Tr. at 315. Moreover, defendants' expert witness Clark testified that, in the same situation, he would not have rejected the applicant to his face, but rather, would have indicated, as Roberts did, that he would consider the matter, and then reject the applicant at a later date. Tr. at 647. Further, the Court cannot find that Wolff relied in any way on Roberts' failure to make an immediate decision, since Roberts informed Wolff on the following day that Ford had rejected the Kieran-Jones proposal.

### d. Kieran-Dobkin

Whether the Court accepts Kieran's deposition testimony that he and Dobkin had failed to team up as co-dealers because Dobkin rejected Kieran, or credits Roberts' testimony that Kieran rejected Dobkin, it appears that there is agreement that the two men did not agree to become business partners and that even if Ford had not rejected the proposed deal, there would not have been two willing partners to go through with it.

### e. Weiss

Since Kieran did not specify the basis for his suggestion that he team up with Mr. Weiss from Volkswagen, and since the testimony does indicate that Ford was looking for a partner for Kieran with some experience in Ford management and marketing, the Court cannot conclude on this record that Ford's failure to accept a Kieran-Weiss combination was unreasonable.

### f. Kieran-other Ford employees

The Court concludes that the Ford policy described by both Roberts and Wolff of not considering employees of other Ford dealerships as dealer applicants unless those employees had received permission from their employers to apply for dealer positions is a reasonable policy based on a desire to promote, rather than raid, existing Ford retail outlets, so that Ford's refusal to consider certain suggested dealer prospects based on this policy was also reasonable.

### B. Estoppel

William Wolff's claims of equitable estoppel rest on the assertion that Wolff relied to his detriment on certain actions by Ford indicating that the Action Ford deal would go through, see e. g., *Ryder Truck Rental, Inc. v. Williamstown Wire & Cable*, 62 Misc.2d 848, 309 N.Y.S.2d 508, 510 (Onondaga Co., 1970) (Estoppel " 'rests upon the word or deed of one party upon which another rightfully relies, and so relying, changes his position to his injury,' " citing *Selzer v. Baker*, 295 N.Y. 145, 65 N.E. 752, 63 N.Y.S.2d 144 (1946)). The testimony at trial does not, however, support such a claim.

First, the evidence does not show that Ford directly assured Wolff that the Action Ford deal would go through under any circumstances. Exhibit 40, the letter of assurances which Wolff's attorney requested and received after the meeting of the parties on November 19, 1974, did not assure Wolff in absolute terms that the Action Ford deal would close; rather, it stated only that the deal would close if Kieran and Moleti complied with the terms of the letter of intent issued to them. Nor does the testimony as to other events in the course of direct negotiations between Wolff and Ford indicate any other basis upon which Wolff could reasonably rely on Ford to close the Action Ford deal under the circumstances which actually developed. Although Wolff did testify that he had indicated to Roberts on

January 9th that "whether Mr. Moleti had the money or not didn't mean a thing to me," since Wolff's agreement was with Ford rather than with Moleti, Tr. at 51, Wolff did not testify that he then insisted, or would have had any basis on which to insist or expect, that Ford conclude the Action Ford deal without Moleti's money. The Court concludes that Ford cannot be estopped from asserting its condition precedent defenses on the basis of any direct indications to Wolff that the Action Ford deal was definite or certain to go through.

With respect to secondary indications that the deal would go through, Wolff and Kieran testified that Roberts either suggested or approved certain steps taken to effectuate the transfer of the Wolff dealership to Action Ford: the conclusion of an agreement between Wolff and Kieran under which Kieran became responsible for the profits and losses of the dealership incurred after November 15, 1974, Tr. at 38; the surrender of Wolff Motors' licenses to do business and the issuance of corresponding licenses to Action Ford, Tr. at 41–45, 150, 156; the replacement of Wolff Motors signs with Action Ford signs, Tr. at 41–45, 150, 156; and Kieran's hiring of prospective dealership employees, Tr. at 153–55. Roberts testified, however, that he was not aware of and did not endorse a profits-losses agreement between Kieran and Wolff, and would be surprised if one had occurred, since he had arranged the subsequent meeting on November 19 to salvage a deal which had just about fallen through on that date, Tr. at 320–22, 382–83. Roberts further testified that he did not direct or even observe any sign changes at the dealership, Tr. at 319, 324, 381, or direct any licensing changes, Tr. at 324, 381, and not only did not encourage hiring by Kieran, but, in fact, repeatedly warned Kieran against incurring expenditures related to the dealership before the deal was closed, Tr. at 383–84.

The Court, finds that Roberts' testimony as to his knowledge of these activities and his directives to Wolff and Kieran is more credible than that of Wolff or Kieran, both because Roberts' overall testimony is more logical and consistent than that of either Wolff or Kieran, and because, in a situation where closing on a particular deal admittedly had been frequently postponed due to difficulties of several sorts, it would make no sense for Ford to encourage expenditures or activities by the parties to the deal in the expectation that the deal would go through until it was, in fact, concluded. Accordingly, the Court finds that any reliance by Wolff on these developments was unrelated to any actions by Ford, and concludes that Ford cannot therefore be estopped as a result of any such reliance.

Finally, the Court notes that it is difficult, if not impossible, to identify any detriment Wolff suffered as a result of any reliance which could have occurred as a result of the cited activities. Wolff's testimony as to the license change indicates only that he suffered the minor inconvenience of being forced to reapply to regain his licenses to do business on the premises. Wolff has come forward with no testimony as to damages he incurred as a result of the change of signs; or as a result of his profits-losses agreement with Kieran (which, it would appear, could only cause detriment to Kieran); or as a result of Kieran's hiring of employees (which, again, would appear only to damage Kieran). As to the overall picture, Wolff remained in possession of the Wolff Motors dealership throughout this period (and, indeed, did so until March 31, 1980), earned a profit during this period, and in effect brought an end to Ford's further efforts to find a replacement dealer himself by bringing this lawsuit. The record thus does not indicate any compelling reason for the Court to exercise its equitable powers to prevent Ford from asserting its contractual defenses.

III.  Conclusion

For the foregoing reasons, the Court concludes that plaintiffs have failed to prove either that the defendants breached their obligations under the Buy/Sell Agreement and the Lease Agreement by frustration of performance of the conditions precedent to each agreement, or that the defendants should be estopped from relying on failure

to satisfy the conditions precedent as a result of any assurances to plaintiffs or other indirect actions indicating that the conditions precedent would be waived or had been satisfied. The remaining counts in the Amended Complaint are, accordingly, dismissed.

SO ORDERED.