**HOHMANN AND BARNARD, INC., Plaintiff-Appellee.**

v.

**SCIAKY BROS., INC., Defendant-Appellant.**

No. 295, Docket 28543.

United States Court of Appeals Second Circuit.

Argued Jan. 23, 1964.

Decided June 3, 1964.

**6**

Maurice J. McCarthy, Jr., of McCarthy & Nathanson, New York City (Laurence D. Kleinman, New York City, of counsel), for appellee.

Brainerd Chapman of Pritchard, Chapman, Pennington, Montgomery & Sloan, Chicago, Ill. (John J. Hayes, New York City, of counsel and Kramer, Marx, Greenlee & Backus, New York City, on the brief), for appellant.

Before FRIENDLY and HAYS, Circuit Judges, and ANDERSON, District Judge.

ANDERSON, District Judge.

The defendant, Sciaky Bros., Inc., a manufacturer of construction equipment, in January of 1957 entered into two written contracts with the plaintiff, Hohmann and Barnard, Inc., to sell to the latter an electric welder and a tooling machine, to be used together by the plaintiff in the fabrication of masonry wall reinforcement assemblies made of heavy wire. This suit was brought by the plaintiff-buyer against the defendant-seller for damages arising out of breach of those contracts; and the defendant counterclaimed for an unpaid balance on the purchase price. The court below gave judgment for the plaintiff on its claim in the amount of $3,936.34 and dismissed the counterclaim. The defendant appeals from both parts of the judgment. We affirm.

The issue before us arises out of the defendant's claimed error in the trial court's award of $3,936.34 to the plaintiff as damages representing what the plaintiff had to pay over and above the contract price to put the machines in working order. One of the machines, the tooling apparatus, tardily delivered by the defendant, was defective and did not conform to the specifications of the contracts; the plaintiff had the machines put in operational condition by a third party, Combined Welder & Machine Corp. The purchase price of the machines was $14,747. The plaintiff made down payments to the defendant in the amount of $9,100 and had to pay $9,583.34 to Combined Welder & Machine Corp. to have the machines made workable. Thus the plaintiff paid $3,936.34 in excess of the purchase price for properly operational machines. The defendant contends, how-

ever, that a limitation of liability clause[1] contained in the contracts afforded the plaintiff the sole remedy of returning the machines for a refund of the purchase price and that, since the plaintiff kept the machines, it waived the breach and now owes the unpaid balance of the purchase price.

The court below discussed waiver but confined its consideration almost entirely to waiver of the limitation on consequential damages in connection with its dismissal of the plaintiff's claim for lost profits and expenses. The plaintiff claimed $20,202.31 as damages incurred when it had to purchase in the open market reinforcing material at a cost greater than the cost at which the machines, promptly delivered and in good operating condition, could have manufactured it. The court below held that these damages were "consequential damages" as contemplated by the limitation of liability clause. It also held that the defendant had not waived, either expressly or impliedly, that portion of the limitation clause which barred such consequential damages and therefore, dismissed the claim. This part of the trial court's ruling has not been appealed, and we mention it here only

because of our affirmance of the judgment below which, in effect, concludes that by their conduct the parties altered their relative rights and duties under other portions of the limitation of liability clause.

By the terms of the contract the defendant had agreed to deliver the two machines by the end of June, 1957. The welder was delivered August 2, 1957, but, by itself, was useless and constituted only half of the machinery necessary to do the job; the tooling apparatus, being manufactured by a sub-contractor, Imagineering Unlimited, Inc., in New Jersey, and not yet delivered, was the other half. The defendant was plainly in default under the terms of the agreement relating to delivery, and consequently the plaintiff could have insisted on its accepting return of the welder and refunding all payments. On September 24, 1957 the plaintiff sent the defendant a telegram[2] offering to return the welder and accept a refund of the portion paid on the purchase price or take delivery of the tooling apparatus.

The trial court said of this proposal: "What plaintiff at first demanded by its nite letter, dated September 24,

1. The following limitation of liability clause was contained in both the contracts:
"For a period of ninety days from the time of shipment of each item of the equipment, the Company warrants that such item shall be of the kind and quality described in the specifications and shall be suitable for performing the work therein described. There shall be no other warranty, express or implied. Within such ninety-day period the Purchaser shall give written notice to the Company of any failure of the equipment to comply with such warranty, specifying such failure in detail, and the Company will with reasonable promptness correct the defect or defects by repair or replacements, at the Company's plant in Chicago, Illinois, of the defective part or parts. If a substantial defect is established which the Company is unable to correct after it has been given an opportunity to do so, the Company will, upon the Purchaser's request and upon return of the equipment f. o. b. the Company's plant, Chicago, Illinois, re-

fund the price to the Purchaser. . . . Except as expressly provided in this paragraph, the Company shall not be liable for any defect in or failure or inadequacy of the equipment or any part or item thereof, and in no event shall the Company be liable for any consequential damages resulting directly or indirectly from any such defect, failure or inadequacy. It is expressly understood that the Company's warranty herein expressed shall, in all events, expire ninety days after shipment."

2. The text of the telegram is:
"RIB9 NITE LETTER CHG SG PD SEPT. 24 SCIAKY BROS. 4915 WEST 67 ST CHICAGO ILL— EXTREMELY DISSATISFIED WITH DELIVERY OF TOOLING OUR ORDER 2304 CONTACT YOUR REPRESENTATIVE N Y C TO PROVIDE TOOLING OR REFUND DEPOSIT AND ACCEPT RETURN OF WELDER
H F HOHMANN—HOHMANN AND BARNARD INC."

1957, in which plaintiff expressed its dissatisfaction with the delivery of the tooling apparatus was in accord with the provisions of the contracts and defendant should then have accepted plaintiff's offer to return the tooling apparatus and welder and should have refunded to plaintiff the $9,100 plaintiff had paid on account of their purchase price."

But the defendant declined to make the refund required by the contract and, though still in default, took up plaintiff's alternative proposal which we read as being that defendant have its New York City representative see to it that the tooling equipment was promptly secured from New Jersey and be made operational at plaintiff's plant.

When the tooling equipment was finally delivered by Imagineering Unlimited on October 11, 1957, at the plaintiff's plant, it proved to be defective and unable to perform the work for which it was designed. The defendant sent its engineers and new parts and over a period of weeks tried to make it operate satisfactorily but could not do so. The court below concluded that the equipment was too light and "unsuitable for the heavy work it was intended to do." The plaintiff gave the defendant more than a reasonable period of time within which to effect the repairs and make the equipment work. On January 10, 1958, the plaintiff notified the defendant that it could give the defendant no longer than February 1, 1958 to put the equipment in operating order. The defendant did not do so, but on February 6th demanded that the plaintiff return the equipment to the defendant's Chicago plant so that the defendant could work on it further. After having warned the defendant on February 9th that it intended to do so, the plaintiff, on February 13, 1958, contracted with a third party, Combined Welder and Machine Corp., to make the necessary repairs to the equipment. The cost of these repairs added to the payments made by the plaintiff to the defendant on account of the purchase price exceeded the purchase price by $3,936.34, which is a proper

measure of the damage and is the amount awarded the plaintiff in the judgment below.

The defendant on this appeal asserts that there was no basis on which the trial court could award any damages to the plaintiff because there had at no time taken place any change in the relative rights and duties of the parties under the limitation of liability clause of the contract. This is another way of claiming that, in spite of the defendant's breach of the contract, the plaintiff on September 24, 1957 gave the defendant indefinite additional time, extended to upwards of four months, to try to make the equipment operational, that the plaintiff got nothing in return for this but continued bound by all of its duties under the contract with its rights to recover for the breach still restricted by the limitation of liability clause, so that at a time eight months after the contract was originally to have been performed by the defendant, and still not performed, plaintiff was required to give defendant a still further opportunity to fix the equipment, sending it to Chicago at plaintiff's own expense and, if that failed, to get a refund. On the other hand, if the plaintiff retained the equipment, as it did, the defendant, as a seller in serious default, both as to the time of delivery and as to the quality of the goods, would have nevertheless recovered one hundred per cent of the purchase price of $14,747, although the buyer had been obliged to spend more than one-half that amount, $9,583.34,—which has never been claimed to be excessive—to make the equipment work.

The trial court did not find that the plaintiff was under any such duty or restricted to such limited recovery but, on the contrary, ruled that the plaintiff had the right to have the equipment made operational by a third party and to recover ordinary damages from the defendant. It held that, while the defendant had not waived the limitation of liability for consequential damages, and the very arrangement by which the defendant was afforded the time by the plaintiff to con-

tinue to work on the equipment from October 11, 1957 to early February, 1958, prevented the accrual of consequential damage, the plaintiff could recover ordinary damage measured by such excess of its cost of repair; and that it was not limited to giving the defendant, now eight months in default in its obligation to furnish workable equipment, a chance to do still further work in Chicago, and, if this should prove ineffective, to obtain a refund. This is a just and fair conclusion in the circumstances of the case. The conduct of the parties from September 24, 1957, when the plaintiff sent its telegram to the defendant, through January, 1958, demonstrates that the terms of the limitation of liability clause as originally framed to cover ordinary damages, were no longer applicable.

After the defendant refused on September 24, 1957 to follow the breach of warranty provisions of the agreement, the parties embarked on a post-default course not specifically covered by the contract: the equipment remained at plaintiff's plant and the defendant was afforded an extended opportunity to repair it there with no duty on the part of the plaintiff to return it to Chicago. By its judgment the lower court concluded that when the defendant again defaulted in early February, 1958, the defendant could not invoke the limitation of liability clause, as it applied to ordinary damages, and that the plaintiff could contract with a third person for the repairs and hold the defendant liable for the excess of their cost over the purchase price.

Indeed, defendant's own conduct in February, 1958, shows it was not relying on the limitation of liability clause. The ninety days had expired in mid-January and if defendant thought the clause still applicable it had only to stand upon that portion which provided "the Company's warranty herein expressed shall, in all events, expire ninety days after shipment."

Although, following September 24, 1957, the parties entered into no formal agreement, their conduct from then to February, 1958, shows that in return for the plaintiff's forbearing to exercise its rights upon the default by the defendant and for giving the defendant additional time to make repairs, the defendant gave up its right to insist on the clause relating to the return of the tooling equipment to Chicago. These were ample considerations for the modification of the written contract. See Corbin on Contracts, § 139; In Re Stafford's Estate, 264 App.Div. 774, 34 N.Y.S.2d 946 (App.Div.2d Dept.1942), aff'd 289 N.Y. 790, 47 N.E.2d 47, (1943); and In Re All Star Feature Corp., 232 F. 1004 (D.C. S.D.N.Y.1916). Moreover, by the first of February, 1958, the course of conduct, which constituted a modification of the written contract, was fully executed so that the plaintiff's right to recover is not barred by § 33-c of the Personal Property Law of the State of New York, McKinney's Consol.Laws, c. 41 [3] which prohibits the change of a written agreement by an oral executory agreement, where the written agreement contains a provision against oral change—even if we should assume that the provision here related to anything more than oral changes prior to the formation of a contract. Einzig v. Aulisio, 286 App.Div. 1127, 146 N.Y.S.2d 410 (3rd Dept.1955); Alcon v. Kinton Realty, 2 A.D.2d 454, 156 N.Y. S.2d 439 (3rd Dept.1956), app. dismissed 2 N.Y.2d 836, 159 N.Y.S.2d 974, 140 N.E. 2d 869 (1957); Young Foundation Corporation v. A. E. Ottaviano, Inc., 29 Misc. 2d 302, 216 N.Y.S.2d 448 (Sup.Ct.1961), aff'd 15 A.D.2d 517, 222 N.Y.S.2d 685 (2d Dept.1961).

The court below discussed at considerable length the facts and conclusions which related to the plaintiff's claim for consequential damages and discussed its reason for denying plaintiff recovery on that claim. That issue is not before this court and we are not called upon to say

---

3. The Section, 33-c(1) of the Personal Property Law, has been redesignated as § 15-301(1) of the General Obligations Law, effective September 27, 1964.

anything about the correctness or incorrectness of that ruling, but what the trial court had to say in support of the position it took in denying consequential damages is not a reason for finding that it was in error in granting the plaintiff ordinary damages.

■ After the defendant defaulted a second time the plaintiff had the right to have the necessary repairs made by a third party and to invoke that portion of the New York Personal Property Law, § 150, subd. 1(b), which allows a buyer, at his election, to "accept or keep the goods and maintain an action against the seller for breach of warranty." Prygelski v. Bloom & Knop, 136 N.Y.S.2d 503 (Sup. 1st Dept.1954); American Elastics, Inc. v. United States, 187 F.2d 109 (2 Cir. 1951), cert. den. 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951); John Fabrick Tractor Co. v. Lizza & Sons, Inc., 298 F.2d 63 (2 Cir. 1962).

The judgment below is affirmed.

HAYS, Circuit Judge (dissenting):

In dashing to the rescue of the plaintiff corporation as if it were a maiden in distress the majority has trampled on the facts as found by the lower court and on some well established propositions of law. The majority opinion absolves the plaintiff from a clause providing for limitation of liability which plaintiff accepted in a signed contract. And this in a situation involving two corporations dealing with each other at arm's length where there is no reason to believe that either of the parties had any particular advantage in bargaining. Far from being a case demanding a sympathetic effort to correct an inequity born of unequal bargaining power, the widowed mother and the slick book salesman, or the simple farmer buying the lightning rods, this is the case of a corporation with a plant in New York and a subsidiary in Alabama ordering to its own specifications a machine to be made especially for its use and costing nearly $15,000. Surely parties who are so evenly matched can be left to make their own contracts without the help of the judges of the Second Circuit.[1]

There is no public policy either national or state against the inclusion in a contract of a clause limiting liability. There is nothing shocking or outrageous about the clause to which the plaintiff agreed in the present case. A manufacturer making a machine for a special purpose to a buyer's specifications may quite properly believe that he requires protection against unforeseen aspects of possible liability. There is nothing in the law as it has been applied in the past which would prevent such a manufacturer from limiting liability to return of the purchase price.

The majority attempts to extricate the plaintiff from the position into which it got itself by making a new finding of oral modification. On September 24, 1957, when delivery was already long overdue, the plaintiff telegraphed to the defendant saying, in effect, "Either deliver my tooling machine or I'll send back the welder and get my money back." [2] The defendant replied by saying it would expedite delivery of the tooling machine. It is in this exchange that the majority professes to find a modification of the original signed contract, although obviously all that happened was that defendant asked plaintiff to waive for the time being its right to return the welding machine and get its money back. And this is exactly what plaintiff did.

To make out an oral modification of the written agreement the majority finds that there was an exchange of promises by the parties. In the first place, says the majority, the plaintiff's telegram was an offer of a promise to forbear returning the welding machine if the defendant would promptly deliver the tooling ma-

---

1. The fact that a later letter from plaintiff to defendant, referring to the contract, was apparently, according to the trial court, "either dictated or approved" by plaintiff's attorney may suggest a further reason why plaintiff does not need the protection of this court.

2. For the exact text of the telegram, see footnote 2 to the majority opinion.

chine and make it operational at plaintiff's plant. Not only is this analysis of plaintiff's telegram the most transparent fiction but of course if the plaintiff's "offer" were accepted according to its own terms, plaintiff's promise would be unenforceable because the defendant would not be required to do anything he was not already under an obligation to do. Ripley v. International Rys. of Cent. America, 8 N.Y.2d 430, 441, 209 N.Y.S.2d 289, 295, 171 N.E.2d 443, 447 (1960); Pershall v. Elliott, 249 N.Y. 183, 163 N.E. 544 (1928); 1 Williston, Contracts § 142 (Jaeger 3d ed. 1961).

The chief objection to the oral modification theory is that the exchange of promises never occurred in fact. The plaintiff's telegram was not a promise or even an offer. There is not the slightest ground for stating that defendant ever promised to repair the tooling machine at plaintiff's plant. Indeed plaintiff never made any claim of such a promise in its complaint, in its testimony, as that testimony is reflected in the court's opinion, or in its brief. The promise which plaintiff claimed it relied on was that: "[defendant] would expedite delivery of the tooling equipment and apparatus, and that it would have the said equipment completed and functioning at the plaintiff's place of business within a reasonable time thereafter."

Even as to this promise, which would be clearly insufficient to support a counterpromise to refrain from resorting to the remedy provided by the contract, the lower court found as a fact that, if made at all,[3] it was made by a representative of defendant who "had no authority to amend the contract or any of the provisions of the conditions of sale."

The "conditions of sale" in the contract provide that: "No change in or deviation from the terms, provisions or conditions of this quotation shall have any effect unless such change or deviation shall have been approved in writing by an officer of the Company."

The trial court found that: "No written approval by any officer of defendant was given for any such change."

Section 15–301, subdivision 1, of the New York General Obligations Law, McKinney's Consol.Law, c. 24–A provides:

"A written agreement or other written instrument which contains a provision to the effect that it can-

---

3. The trial court found that even if there was such an agreement as plaintiff alleged, it constituted no waiver either express or implied of "any of the printed conditions of sale." In the light of this conclusion the court did not consider it necessary to make a definitive finding as to whether there was, in fact, such an agreement. The court does say, however:

"The alleged waiver is not mentioned in any of the written communications from plaintiff to defendant. The McQuillan letter of January 10, 1958 (Ex. 35) does not mention any waiver of any of the conditions of sale. It does not allege any new agreement."

\* \* \* \* \*

"Nor was there any mention of any alleged new agreement or of any waiver of the conditions of sale, in Exhibit 39, plaintiff's letter of February 4, 1958. If there had been any new agreement between the parties involving any waiver by defendant of the conditions of sale it would have been mentioned. Apparently plaintiff's attorney either dictated or approved that letter before it was sent. A line at the end of the letter would so indicate. The only con-

tracts mentioned in the letter dated February 4, 1958 (Ex. 39) are those based on defendant's quotations and plaintiff's orders of January 1957. No new contract is claimed."

This language is equivalent to a finding of fact that there was no such agreement.

The existence of such an agreement was a factual question depending on the statements and representations of the parties in their conversations and written correspondence. Judge Leibell's opinion states that the testimony was in conflict:

"The alleged agreement set forth in paragraph Tenth of the amended complaint according to plaintiff's contention was made by defendant's Mr. Spoliansky, in a telephone conversation between him and plaintiff's Mr. McQuillan. Defendant denies that any such agreement was made \* \* \*"

The majority has no ground whatsoever for disregarding the trial court's findings and making new findings on this issue. See Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 547 (2d Cir. 1962); Orvis v. Higgins, 180 F.2d 537, 539–540 (2d Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950).

not be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

The case against an oral modification which had the effect of eliminating the limitation on liability is, then, in summary:

(1) There is nothing whatever to support the majority's conclusion that the defendant made an enforceable promise which would constitute a modification of the written contract.

(2) If any promise at all was made it was made by a representative of defendant who was not authorized to agree to any modification of the agreement.

(3) In any event an oral modification of the agreement would have been wholly without effect under the New York statute.

This court should reverse the decision below and order the entry of judgment for the defendant on both plaintiff's claim and defendant's counterclaim.