**SEVEN–UP BOTTLING COMPANY (BANGKOK), LIMITED, Plaintiff,**

**v.**

**PEPSICO, INC., Defendant.**

**No. 87 Civ. 5503 (KC).**

United States District Court, S.D. New York.

May 3, 1988.

Bruce P. Keller, DeBevoise and Plimpton, New York City, for plaintiff.

Ronald S. Rolfe, Cravath, Swaine and Moore, New York City, for defendant.

## OPINION AND JUDGMENT

CONBOY, District Judge.

This case was tried before the late Honorable Edward Weinfeld without a jury, and a fully submitted record was before him for decision at the time of his death. The parties have agreed, pursuant to Rule 63 of the Federal Rules of Civil Procedure, that this court may make findings of fact and conclusions of law, and enter judgment upon the matter.[1]

Plaintiff, Seven–Up Bottling Company (Bangkok), Limited, a soft drink bottler, seeks an injunction and damages for breach of contract and tortious interference with business.[2] The alleged breach relates to certain licensing contracts entered into with Defendant's predecessor in interest, the Seven–Up Company. Defendant counterclaims and alleges that Plaintiff breached the contracts in question, entitling Defendant to terminate them.

Originally Plaintiff sought a temporary restraining order and a preliminary injunction ordering Defendant to continue supplying soft drink extract pursuant to the contracts. The motion for a temporary restraining order was denied and, at the suggestion of Judge Weinfeld and on agreement of the parties, the action on the merits was advanced and consolidated with the hearing on the application for the preliminary injunction.[3] Defendant's counterclaims were not to be tried in this proceeding. A three-day trial followed, based upon which the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff is a Thai corporation engaged in bottling and distributing soft drink beverages for retail sale, including Seven–Up and Royal Crown brand soft drinks. The current owners of Plaintiff purchased the business in 1980 for approximately $1.2 million. Plaintiff's predecessors in interest had bottled and distributed Seven–Up products since 1953.

On December 6, 1980, Plaintiff entered into a licensing agreement with the Seven–Up Company (the "Seven–Up Agreement"), pursuant to which Defendant was granted

1. This is a corrected version of the Court's Opinion and Judgment dated April 28, 1988.

2. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

3. Fed R.Civ.P. 65(a)(2).

the right to bottle and distribute Seven–Up trademarked soft drink products in Thailand. On January 1, 1982, Plaintiff entered into a second licensing agreement with the Seven–Up Company (the "Howdy Agreement"), pursuant to which Plaintiff was granted the right to bottle and distribute Howdy soft drink products in Thailand. Both agreements run through December 31, 1990, and may be terminated or extended only in accordance with their terms. Supplemental undertakings with respect to a "post mix process" under both the Seven–Up and Howdy Agreements were signed on April 1, 1983, and are not directly germane to the matters under review.

Defendant PepsiCo is a North Carolina Corporation with its principal place of business in Purchase, New York. Through various divisions and subsidiaries Defendant is engaged, among other things, in the business of manufacturing concentrates or extracts from which soft drink beverages are bottled and sold by bottlers. On July 11, 1986, Defendant PepsiCo acquired the international business of the Seven–Up Company, that is, its subsidiary, Seven–Up International, and has operated it since that time through one or more divisions or subsidiaries.

The principal dealings of the parties under the contracts in question have been carried out between Seven–Up Bottling Company (Bangkok), Limited (hereinafter, the "Bottler") and Seven–Up International (hereinafter, the "Company").

The 1980 Seven–Up Agreement is a detailed and comprehensive undertaking which defines the relationship and obligations of the Company and the Bottler. In substance, it conveyed a license to the Bottler to manufacture, bottle and market in Thailand soft drinks made from the Company's soft drink extract, along with the use of its trademarks. The Bottler undertook to order, and the Company to provide, sufficient quantities of extract to implement the Agreement, with an explicit proviso that shipments of extract could be delayed if the Bottler became delinquent in its obligations to the Company. The Bottler agreed to maintain its facilities and take certain steps to enlarge its bottling capacity and warehouse facilities, and both the Company and the Bottler agreed to purchase certain quantities of bottles and shells for use of the Bottler in the performance of the contract. The Bottler obligated itself to submit its relevant business records at reasonable intervals to the Company, and to maintain and foster the goodwill and reputation of the Company in its exercise of the license.

The three key clauses of the Agreement, with respect to this lawsuit, relate to distribution levels of the product to be achieved by the Bottler, minimum sales levels of the product to be achieved by the Bottler, and advertising budgets to enhance the marketability of the product in Thailand. The parties explicitly agreed that the Bottler would "assure a minimum distribution of the Product in at least thirty-five thousand (35,000) bars, restaurants, establishments, food stores and other outlets offering the retail sale of beverages by December 31, 1981. Thereafter, Bottler shall maintain a distribution of Product to at least forty-six (46%) percent of all such outlets in the Territory" (PX2, ¶ 14).

The parties further explicitly agreed that the Bottler would "achieve minimum annual sales of the Product totaling one million two hundred thousand (1,200,000) cases" during calendar year 1981 and increasingly higher sales levels, in subsequent years, of 2,100,000 cases (1982); 3,300,000 cases (1983); 3,900,000 cases (1984); 4,500,000 cases (1985); and in each succeeding year, sales would increase over the previous year's sales at least in the same ratio as those achieved by the soft drink industry as a whole over the previous year in the Territory (Thailand) (PX2 ¶ 15).

The parties further explicitly agreed to jointly establish annually an advertising and promotional budget for the succeeding calendar year, and upon failure to establish a budget, that the minimum expenditure for this purpose and proportional contribution of each party would be calculated on the basis of a stipulated formula (PX2 ¶ 16).

The contract had a ten year term, with an automatic renewal for five years unless terminated on written notice by either party at least six months prior to the expiration date of the initial term. The parties explicitly agreed that the Company had the right to unilaterally terminate the contract upon six months written notice if the Bottler defaulted on any of its obligations under the agreement (PX2, ¶ 19(a)), and upon ninety days written notice if the Bottler failed to achieve the aforementioned distribution and sales levels (PX2, ¶ 19(b)).

The parties explicitly agreed that the Company had the right to discontinue supplying extract if the Bottler breached the contract or failed to fulfill any obligation under it, and that the Company could do so without waiving its right to terminate the full agreement for the same cause (PX2, ¶ 24).

Other relevant provisions explicitly exclude delay, omission or failure to exercise a right or remedy under the contract as a basis for waiver of the right (PX2, ¶ 31), and preclude any change in the agreement, except in writing and on approval of the parties (PX2, ¶ 34).

During the course of 1981 and 1982, the parties had a satisfactory relationship under the agreement. Plaintiff began rehabilitation of its plant in Bangkok, upgraded its bottling assembly line, and made a major purchase of bottles and equipment. Operational efficiency improved, as did the overall quality of the product. Most significantly, soft drink sales improved, from 350,000 cases in 1981 to 856,000 cases in 1982. Notably, however, these sales results were below those required by the agreement. Nonetheless, Plaintiff was selected for a 1982 World Class Bottling Award by the Company.

In accordance with the 1980 negotiations, an employee of the Company, Tony Pang, was deputized to work as a marketing assistant at the Bottler in 1981 and 1982. During the course of his labors there, no complaints about his qualifications, performance or conduct were made by the Bottler to the Company. Indeed, at the conclusion of his service, he was offered a permanent position at the Bottler, which he declined.

In January of 1983, Surin Dunn was appointed Managing Director of the Bottler, and the fortunes of the Bottler thereafter began a course of deterioration. Its annual product sales declined in that and every succeeding year. The upgrading of the Bottler was stopped, and a policy of cost cutting ensued. Financial problems materialized, and from time to time severe fiscal instability hampered various phases of its operations. For example, the failure to pay bills for advertising led to a period of several months where its media profile was substantially absent from the Territorial marketplace. At this point, the Company formally noted the Bottler's minimum sales failure for the year 1982, and underscored its intention not to waive its termination rights under the 1980 Agreement. Two representatives of the Company, however, minimized the ominous tone of the warning, and the Company sought alternatives to deal with the Bottler's woes.

During 1984, the Bottler experienced labor problems. Furthermore, its sales figures for the previous year showed continuing inability to meet the minimum levels set out in the 1980 Agreement. The 1983 sales figures were 733,500 cases, as against the 3.3 million cases required by the Agreement. Indeed, the 1983 results represented a 15% decline from the previous year's substandard performance. When the Company noted the Bottler's recurring breaches and reaffirmed that it was reserving its rights to terminate, the Bottler's General Manager telexed the Company and said: "... ACKNOWLEDGE ALL YR POINTS. TRYING OUR BEST IN HOPE SOME POSITIVE RESULTS WILL SHOW SOON" (DX 111).

It is helpful at this point to focus precisely on what "points" of the Company the Bottler was acknowledging in this telex of January 20, 1984. Its General Manager, Mr. Dunn was responding to a January 13, 1984, letter from Harry W. Lynch, III, the Company's regional director based in Hong Kong. Referring to a previous luncheon meeting the two had had at the Oriental

Hotel, Mr. Lynch says that "we both agreed that . . . your company's performance was far below our original expectations . . . (The Company) has cause to terminate (Bottler) as a 7–Up franchise . . . case sales have been very poor, route trucks are being sold or scrapped, outlet coverage continues to shrink, another of your key managers has left, and our main supplier of services, Leo Burnett–Diethelm, has still not been paid for 7–Up media billed to (you) in June 1983 . . . the distribution base is rapidly eroding, and the sales of the flagship brand are in decline . . ." (DX 26).

Following up on his telex, Mr. Dunn on January 20, 1984 wrote to Mr. Lynch, thanked him for "reiterating our communications formally, and (I) agree with you in all your observations. I must apologize for causing you and your organization so much difficulties . . . I cannot tell you exactly what went wrong, but for one reason or another all the people who bear the responsibility for sales results are no longer with us. Now we just have to deploy a more economical and sensible approach to sales and marketing, and we hope to produce some positive results given some time for adjustment." (DX 28) After meeting with Mr. Dunn on April 27, 1984, Mr. Lynch again wrote to him, on May 7, 1984, and warned: "If, over the next several months, (the Bottler's) sales and distribution continue to erode from last year's levels, we must face facts and consider the exercise a failure . . ." (DX 115).

In July, 1984 the Company handed the Bottler a draft settlement agreement that would terminate the franchise. On January 22, 1985, the Bottler responded with a "Five Year Plan" for 1985 through 1989, in which sales figures were forecast and an additional $8 million investment by the Company in the Bottler was called for. The court notes parenthetically that the forecasted sales figures were not in fact achieved in 1985 or 1986.

In response to the Bottler's Five Year Plan, the Company advised that it would give the Bottler one additional year to prove its viability for maintenance of the franchise, that it would reduce the 1985 minimum case sales requirement to 2 million cases, that it would increase its advertising support, but that it would not make the investments requested by the Bottler. While waiting for a response to this proposal, Mr. Lynch told Mr. Dunn on February 8, 1985, that ". . . we want to be a big brand or exit the market. We cannot effectively compete with Coke and Pepsi without broadcast advertising, which is completely unjustified given (your) distribution coverage" (DX 43).

At the time of a change in management of the Company's international operations, the new President wrote to the Bottler in March, 1985 answering its letter of February 8, 1985, and stated that "(your) performance has clearly not met the requirement of the existing 7–Up agreement . . . you wrote . . . that the sales targets were totally unrealistic. When 7–Up was refranchised to your company in 1980, we all knew that much work would be necessary in order to create market acceptance of 7–Up and to overcome a negative market attitude that had been created in the years prior to 1980. Nevertheless, both your company and ours believed that the minimum sales figures set forth in the 1980 7–Up agreement were realistic, and these figures were freely agreed to by both companies" (DX 53). He also rejected claims by the Bottler that its troubles were attributable to Tony Pang, and that the Bottler's labor problems were attributable to the Company's interference. Finally, he said that "we have considered termination of our agreement . . . because of your . . . inability to stop the dramatic decline in 7–Up sales since early 1983 . . . your . . . poor performance speaks for itself . . . (it) has damaged our reputation as an international soft drink company, particularly in view of the fact that (you) bear our name" (DX 53).

Ultimately, on March 11, 1985 an ancillary agreement was reached in principle to give the Bottler the additional year in which to establish its viability. The Company agreed to provide market support with the Bottler on a 50/50 basis up to 6,000,000 Baht (Thai currency) (DX 52), if

725,000 cases of 7–Up and 200,000 cases of Howdy soft drink were sold in 1985, and to pay an additional incentive of 3,000,000 Baht (approximately $115,000) directly to the Bottler if these requirements were met. Three weeks later, the Company advised the Bottler that the forthcoming cooperative marketing expenditure agreement notwithstanding, it continued to reserve all its rights under the 1980 Agreement (DX 54). On April 16, 1985 the Cooperative Marketing Expenditure Agreement for 1985 was executed by the parties, embodying the aforementioned agreement in principle reached on March 11, 1985. Similar agreements to jointly finance advertising the brands in the Territory had been executed in 1983 and 1984, but without the incentive proviso. In 1983, the Company conditioned its marketing support upon 7–Up sales of 1.2 million cases (as opposed to 3.3 million cases required under the 1980 Agreement) and in 1984 upon 1.2 million cases, as opposed to 3.9 million cases called for in the 1980 Agreement.

In a letter dated August 5, 1985, the Company wrote the Bottler and reviewed the 1984 sales figures, which under the 1980 Agreement were to reach 3,900,000 cases, and which in fact amounted to only 55,600 cases, a 24% decline from the actual sales results of the previous year. The Company admonished the Bottler to bear in mind that it had received a year of grace in spite of the 1984 failure, that it was expected to sell at least 725,000 cases in 1985, and that the Company expressly reserved all its termination rights under the 1980 Agreement (PX 15). Mr. Dunn, the Bottler's General Manager, expressed annoyance with this letter, but was told by a representative of the Company at lunch on September 4th that "... you signed an undertaking/a contractual obligation to do 725,-000 for 7–Up, and to be fair, you cannot expect a status quo if by the end of the year, the figure is not met" (PX 27).

The Company complied with its obligations under the 1985 cooperative marketing agreement, contributing its share of the required marketing funds, and sought to alleviate the Bottler's depleted extract inventory, which difficulty was aggravated by problems with the Bottler's letters of credit. In one instance, a shipment of extract remained for sixteen months in a warehouse until a confirmed letter of credit was forthcoming. In another instance, delivery was blocked by the Bottler's bank because of the Bottler's severe credit difficulties. In September of 1985, the Company forwarded $13,000 in marketing funds, but the bank seized it to pay the Bottler's debts. The Bottler's truck fleet was reduced from 40 to 20, and by 1986, to only 10. A number of trucks were seized to satisfy debt, the work force was cut by 50%, leading to diminished sales efforts, and the Bottler consistently failed to meet the payroll. Mr. Dunn's family financial company, which was closely tied to the Bottler, had been taken over by the Thai Finance Ministry in 1984, and the Bottler's creditors formally considered taking control of it in December, 1985.

In the face of all this, and with the full knowledge of the Bottler, the Company indicated it would support such an effort by the creditors, but only if new working capital was infused, which never materialized.

In January 1986, the imminent sale of Seven–Up International to PepsiCo, Inc., Defendant herein, was announced. The Company nonetheless, in January 1986, outlined a cooperative marketing agreement for that year, but no written understanding was ever executed. On May 23, 1986, the Company's counsel wrote a letter to the Bottler and raised questions concerning sales reports and extract inventories, warning that the Company reserved its right to terminate the franchise. Almost a month later, on June 27, 1986, the Bottler sent a telex asking for clarification. In a return telex, a model of decorous restraint, the Company nevertheless betrayed its exasperation: "... clearly the letter from the law firm asked a question of clarification on 7–Up extract usage and reminds business partner/s of the spirit of the franchise agreement. Kindly respond, including the many phone calls and telexes asking for a (sic) simple monthly sales figures. It costs

us effort, money and time to repeat a request eight times" (PX22).

Another month passed, and on July 31, 1986, the Company again wrote the Bottler and specifically referred to multiple breaches under clauses 2, 10 and 14 of the 1980 Agreement, and the "wide variety of concessions" made by the Company in "efforts to assist the Bottler" (PX 13). It reaffirmed its reservation of rights to terminate the franchise under these circumstances.

In August 1986, after PepsiCo, Inc. had formally acquired Seven–Up International, its regional official, Mr. Paul Roberts, met with the Bottler and sought to develop plans to jointly improve the marketing of the brand. He toured the Bottler's Bangkok bottling plant and found it run down and not in production. He also made a market tour and found 7–Up distribution to be markedly uneven in various sectors of the City. Shortly thereafter, Mr. Dunn threatened to sue if the Bottler didn't receive a guarantee of renewal of the franchise.

In November of 1986, Mr. Roberts again met with officials of the Bottler, and complained that no monthly sales figures had been forthcoming, as required by the Agreement, since May, 1986. The Company declined to ship anymore extract to the Bottler, until the withheld data, required under the Agreement, was forthcoming. On the basis of the Bottler's response, Mr. Roberts determined that the franchise should be terminated. On November 5, 1986, he notified the Bottler that the 7–Up and Howdy Agreements would be terminated. On May 5, 1987, a termination letter, effective August 4, 1987, was delivered to the President of the Bottler.

It is established that the Bottler never achieved the minimum sales requirements set forth in the 1980 Agreement for any of the years 1981 through 1985. An aggregate of 15 million cases sold was called for throughout this period, but only marginally more than 3 million were actually sold, meaning 80% of the anticipated sales were not achieved. In 1986, the 1980 Agreement required sales of 4.5 million cases, and only 200,000 cases were actually sold.

Even if the cooperative marketing expenditure agreements of 1983, 1984 and 1985 formally modified the requirements of the 1980 Agreement for those years, none of the reduced projections were reached either: 1.2 million cases for 1983, 1.2 million cases for 1984, and 725,000 cases for 1985.

Furthermore, Plaintiff has not controverted the evidence submitted by Defendant that the distribution levels of the product reached only 16.5% in greater Bangkok and 5% outside greater Bangkok, far short of the 46% penetration rate for the Territory required by the 1980 Agreement. Indeed, Mr. Dunn conceded on cross examination that the Bottler never, during the period 1981 through 1986, achieved the minimum distribution levels required (TR. 91).

It is also clear that the provision of the Agreement requiring the production of sales figures and records by the Bottler for the Company's scrutiny was repeatedly not complied with, at least during 1986.

## CONCLUSIONS OF LAW

■ The Court will apply New York law in the resolution of this case, since the parties agree that on the principal questions at issue here, the law of the Kingdom of Thailand and the law of New York are not fundamentally dissimilar. (Plaintiff's Post Trial Brief, p. 12; Defendant's Post–Trial Memorandum of Law, p. 19). See *Walter E. Heller & Co., v. Video Innovations, Inc.,* 730 F.2d 50, 53, (2d Cir.1984) (where there was no material difference between New York and Illinois law, reference to New York law was proper).

■ The terms, provisions, and conditions of the 1980 Agreement between Plaintiff and Defendant's predecessor in interest, are valid and enforceable. Under certain conditions, however, a written agreement which provides that it cannot be modified except by a writing, can be modified by a course of conduct or actual performance. *Puma Industrial Consulting, Inc. v. Daal Associates,* No. 84 Civ. 3137, Slip

op at 5 (S.D.N.Y. Sept. 9, 1986) [available on WESTLAW, 1986 WL 10281] (agent's commission reduced from contract amount due to parties' course of conduct), *modified,* 808 F.2d 982 (2d Cir.1987); *Hohmann & Barnard Inc. v. Sciaky Bros.,* 333 F.2d 5, 9 (2d Cir.1964) (course of conduct was fully executed and constituted a modification of written contract despite prohibition in contract against modification); *Webster's Red Seal Publications, Inc. v. Gilberton World Wide Publications, Inc.,* 67 A.D.2d 339, 341, 415 N.Y.S. 2d 229, 231 (1979) ("modification of agreement implied in fact from the course of the conduct of the parties"), *aff'd,* 53 N.Y.2d 643, 421 N.E.2d 118, 438 N.Y.S.2d 998 (1981).

■ Furthermore, valid and enforceable rights under a contract may be waived by a subsequent writing or a subsequent course of conduct. *Jefpaul Garage Corp. v. Presbyterian Hospital,* 61 N.Y.2d 442, 462 N.E.2d 1176, 474 N.Y.S.2d 458 (1984). However, a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future. *See, S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.,* 307 F.2d 750 (2d Cir.1962) ("there is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon performance at the due date and by urging and encouraging the other parties to perform thereunder"); *Canda v. Wick,* 100 N.Y. 127, 2 N.E. 381 (1885) (mere efforts on the part of the innocent party to persuade the promisor, who repudiates his agreement, to reject repudiation and proceed honorably to the performance of his agreement, do not, when the efforts finally prove unsuccessful, involve a waiver of the innocent party's right to avail of the breach). Additionally, waivers of rights in contract will not be inferred unless the intent to waive is clear. *Schubtex Inc. v. Allen Snyder, Inc.,* 49 N.Y.2d 1, 399 N.E.2d 1154, 424 N.Y.S.2d 133 (1979) (Gabrielli, J., concurring).

Plaintiff contends that Defendant modified the relevant requirements of the 1980 Agreement by a subsequent course of conduct and by the subsequent, written cooperative marketing agreements. It further contends that even if no modifications occurred, Defendant's subsequent and protracted course of conduct constitutes a waiver of rights under the Agreement to declare breach and terminate the franchise.

■ Upon the basis of the aforesaid findings of fact herein, the Court concludes that the provisions of the 1980 Agreement relating to minimum sales requirements for the years 1983, 1984 and 1985 only, were modified, in accordance with the terms of the Agreement, by the subsequent, written cooperative marketing expenditure agreements of 1983, 1984 and 1985, respectively. The Court further concludes that the record demonstrates no subsequent course of conduct (i.e., extrinsic to the writings) by Defendant that modified, contravened or resettled any of the terms of the Agreement as written in 1980, and supplementally written in the comparative marketing expenditure agreements of 1983, 1984, and 1985. These narrow, subsequent written modifications in no way affected or altered the provisions of the 1980 Agreement relating to distribution levels, submission of business records, or the obligation to effectively promote the brands in Thailand.

■ Furthermore, upon the basis of the aforesaid findings of fact herein, the Court concludes that Defendant repeatedly, emphatically and unambiguously, orally and in writing, reserved its rights to declare breach under the contract, and terminate Plaintiff's franchise, and that no waiver of rights by Defendant has been established.

■ Plaintiff has invoked the doctrine of equitable estoppel and asserts that it is a bar to termination of the franchise by Defendant, since Plaintiff invested in the franchise as a consequence of Defendant's continued operation under the 1980 Agreement. But the line of cases cited, *see,* for example, *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 366 N.E.2d 1279, 397 N.Y.S.2d 922 (1977), authorizing parol evidence to prove oral modification of written con-

tracts, to support a holding that a party can be estopped from invoking a statute or the written contract to bar such proof, is not apposite. Here, proof of oral modification, such as it was, was admitted in the proceedings. More importantly, the sales and distribution levels *actually achieved* by Plaintiff were never agreed to, either in supplemental written agreements or through a course of conduct; the obligation imposed upon Plaintiff to produce business records as required in the Agreement was never modified by any course of conduct of Defendant, and Plaintiff's undisputed obligation to adequately promote and develop the market for 7–Up products in Thailand was in no way modified or altered by Defendant's course of conduct. Indeed, Plaintiff's equitable estoppel argument, to be convincing, would require an established course of conduct by the parties that would in effect, amount to a total repudiation of Plaintiff's principal obligations under the 1980 Agreement, with retention of the franchise by it on a virtually unconditioned basis. This plainly has not been established, and this plainly did not happen.

Upon the basis of the aforesaid findings of fact herein, the Court concludes that the investment actions taken by Plaintiff, referred to in the record in only the most amorphous and undifferentiated terms, were taken in general pursuit of its business interest in the franchise and not in response to any collateral or extrinsic action or representation by Defendant, and that any detriment suffered by Plaintiff in connection with carrying out the terms of the Agreements has not been established as attributable to Defendant. Accordingly, no estoppel precluding enforcement of the contracts ever arose. *See, generally, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34 (2d Cir.1977); *Grandonico v. Consortium Communications International, Inc.*, 566 F.Supp. 1288 (S.D.N.Y. 1983).

Indeed, Plaintiff's claims in this regard give new meaning to the old, cynical aphorism that no good deed (in this case, a series of good deeds) shall go unpunished. The record establishes the almost limitless patience and forbearance on the part of Defendant with respect to Plaintiff's dis-

mal performance under the contract. In this connection, it is useful to bear in mind that Defendant gave more money in marketing funds to Plaintiff than it received in revenues from extract sales to Plaintiff. A Plaintiff's witness testified that the Bottler received approximately $1 million in marketing support from the Company (Dunn, Tr. 135). The Bottler purchased 20,376 units of extract (PX ¶ 10, as amended) at approximately $36 per unit (Dunn Tr. 13, PX 7 at 34) for a total of $733,536 in revenue to the Company.

■ The Court concludes that Plaintiff breached the minimum sales requirements for 1981, 1982 and 1986, and the modified minimum sales requirements for 1983, 1984 and 1985.

■ The Court concludes that Plaintiff breached the minimum distribution requirement of the 1980 Agreement, which was in no way modified by any subsequent understanding or conduct of the parties.

■ Plaintiff concedes that relevant business records, subject to production on demand under the Agreement, were not tendered to Defendant until March 27, 1987. The Court concludes that Plaintiff was in violation of clause 10 of the Agreement through most of 1986.

■ The Court concludes that Plaintiff's breaches with respect to minimum sales and distribution requirements, and collaterally its production and fiscal difficulties, operate to constitute a breach of its further obligation under the 1980 Agreement to adequately promote and develop the market for 7–Up products in Thailand.

■ The Court concludes that Defendant did not breach the 1980 Agreement when it suspended extract deliveries to Plaintiff in November, 1986 since multiple breaches of the Agreement by Plaintiff had already occurred.

■ The Court concludes that the termination by Defendant of the 1980 Seven–Up Agreement and the 1982 Howdy Agreement, effective August 4, 1987, was in all

respects within the legal right and prerogative of Defendant.

▮ The Court concludes that there is an insufficiency of evidence in the record to establish impossibility of performance by Plaintiff under the agreement, and in any case such would be grounds for terminating, not maintaining, the franchise.

Accordingly, the relief sought by Plaintiff is in all respects denied, and the Clerk is directed to enter judgment in favor of Defendant.

SO ORDERED.