In the Matter of the Estate of CECILIA J. CARR, Deceased. CITIBANK, N. A., as Executor of CECILIA J. CARR, Deceased, et al., Appellants; UGO PICCIRILLO et al., Respondents.

First Department, March 6, 1984

APPEARANCES OF COUNSEL

*John Anthony Smith* of counsel (*Anthony J. Distinti, Jr.,* with him on the brief; *Turk, Marsh, Kelly & Hoare* for appellants.

*Norman A. Senior* of counsel (*Greenfield Eisenberg Stein & Senior,* attorneys), for respondents.

*Robert Abrams, Attorney-General,* for ultimate charitable beneficiaries, appellant.

OPINION OF THE COURT

BLOOM, J.

This is a discovery proceeding brought by Citibank, N. A., as executor of Cecilia J. Carr, deceased, and the Attorney-General of the State of New York, as statutory representative of the ultimate charitable beneficiaries of the Carr estate, to recover certain moneys and property transmitted and conveyed to the Piccirillos prior to Cecilia

J. Carr's death in August, 1981. The specific controversy before us centers about a motion for partial summary judgment in which petitioner seeks recovery of the sum of $63,000 concededly lent by Mrs. Carr to the Piccirillos which, they contend, was thereafter converted into a gift. The Piccirillos also contend that the doctrine of equitable estoppel bars granting the motion. The learned Surrogate held that there were unspecified material issues of fact which precluded partial summary judgment and denied the motion. We disagree. Accordingly, we would grant partial summary judgment to petitioners in the sum of $63,000 for the moneys lent by Mrs. Carr to respondents.

The deceased first met the Piccirillos, then husband and wife, some time in 1976. She was then a 74- or 75-year-old widow, without any known living relatives. Mrs. Carr, who was interested in Japanese prints, frequented an art gallery operated by the Piccirillos and, seemingly, a fast friendship grew up among them. So completely captivated was deceased by the Piccirillos that on March 4, 1977 she executed a general power of attorney to Ugo Piccirillo. The following month, in three installments covering a period of 10 days, she lent the $63,000 here in question to the Piccirillos to enable them to expand their art gallery.

Though not in question on this motion for summary judgment, although part of the discovery proceeding, Mrs. Carr was also the owner of real property in Los Angeles County, California, which was valued at between $300,000 to $500,000, and a summer home in Bucks County, Pennsylvania, which stood on 16.5 acres of land and which was valued at $200,000. Both of these parcels were transferred to the Piccirillos, the California property by quitclaim deed dated April 27, 1977 and the Pennsylvania property by deed dated May 16, 1979. No consideration other than the recital of a $10 payment, noted in the deed to the Pennsylvania property, is indicated.

The deed to the Pennsylvania property was recorded on August 13, 1979. The deed to the California property was not recorded until after the death of Mrs. Carr. However, up until the date of her death the deceased continued to pay taxes on these parcels of real property. Also part of the discovery proceeding, although not involved in this motion

for summary judgment, are a not insubstantial number of antiques which had been stored in a warehouse in Pennsylvania and which, it is alleged, came into the possession of the Piccirillos by means still unknown to the executor.

It is undisputed that the $63,000 which was lent by Mrs. Carr to the Piccirillos was in fact lent. With respect to the claimed gift Ugo Piccirillo testified at his examination before trial that the forgiveness occurred in a single conversation. In answer to the question "When was that?" he responded:

Oh, sometime in 1979, I had repeatedly asked her that this money, which I had which belonged to her, I wanted to give it back, and she said, "I want you to keep it, because, in business, when a person is starting out in business, they need all the help you can get, and the more money you have, the more successful you will be."

So I said, "Well, money does help when you go into business, when you are trying to make business deals, but," I said "since the jean business is no longer feasible because of the currency rates, the currency fluctuations, that I want to return this because it is a nuisance just to have it in my bank account."

And she said, "Look, I don't need money. I don't even spend what I make on my income. I hardly live just on more Social Security and very minimal. I don't spend that much money."

I said, "Why don't you do something? Why don't you keep the money, because you are going to need it in life later on." And I said, "Lily, its ridiculous. I mean, what are you doing?"

So she said, "Look, don't tell me what to do. I want you to have the money. I don't want you to give it back to me. I don't want to hear anything about it any longer. I want you to have it."

And I was very shocked. I mean, I couldn't believe what she was doing.

After that, I tried in telling her that it wasn't fair, it wasn't a good idea to give me this stuff, to give me the money. She already had given me the house. I said "What are you doing? You are giving me everything. This is ridiculous. It doesn't make sense."

She said, "I want you to have the money. I don't want you to give it back to me."

That was it * * *

Q. Did Mrs. Carr ever write any letter or anything concerning this the way she did with the deed?

A. No, she never did that.

Annette Piccirillo, the then wife of Ugo, testified at her examination before trial as follows:

Q. When did Mrs. Carr forgive the loan that she made about the blue jeans?

A. Oh, well, she spoke at various times. When Ugo said, "I have to give you back the money," she said, "Oh, forget it. I don't need it." You know. That is the way she spoke about it. She just mentioned it at various times. At various times, he wanted to start making the payment. He wanted to do it in three times, and she said, "Oh, well, use it for the business. I don't need it. I have enough money." So that's the way she put it.

Q. Was she saying, "I forgive the loan," or was she saying "Keep it. Don't pay it back now".

A. She said, "You can have it. I don't need it. You can have it."

## I

It has long been the rule in this State that a debt owing from one party to another will not, by a mere oral declaration subsequently made, be transformed from a debt to a gift (*Doty v Willson,* 47 NY 580, 583; *Van Cleef v Maxfield,* 103 Misc 448, 451, affd 186 App Div 906; *Matter of Stein,* 50 Misc 2d 627, 628; *Cohen v Cohen,* 107 Misc 635, 637; 25 NY Jur, Gifts, § 38; 63 ALR2d 259). The reason therefor lies in the elements necessary to effect a gift *inter vivos.* Such a gift "is a voluntary transfer of any property or thing by one to another without consideration. To be valid it must be executed. There must be a delivery by the donor such as will place the property or thing given under the control of the donee, and there must be an intent to vest title in him." (*McKenzie v Harrison,* 120 NY 260, 265-266; see, also, *Matter of Szabo,* 10 NY2d 94, 98; *Matter of Van Alstyne,* 207 NY 298, 306; *Newell v National Bank of Norwich,* 214 App Div 331.) "[D]elivery by the donor, either actual or constructive, operating to divest the donor of possession of and dominion over the thing, is a constant and essential factor in every transaction which takes effect as a completed gift. Anything short of this strips it of the quality of completeness which distinguishes an intention to give, which alone amounts to nothing, from the consummated act, which changes the title. The intention to give is often established by most satisfactory evidence, although the gift fails." (*Matter of Van Alstyne, supra,* p 306.)

Here, there was no actual delivery (*Matter of Szabo,* 10 NY2d 94, *supra*). Indeed, there could not be since the deceased no longer controlled the moneys lent although the right to control remained in her. Similarly, there was no symbolic delivery. Thus, to effect delivery in the circumstances here presented something more than mere words was necessary. That something could have been a writing evidencing her intent to divest herself of the right of control. Since no such writing was ever executed and "Equity will not help out an incomplete" transfer (*Vincent v Rix,* 248 NY 76, 83), an essential ingredient of the donative process is missing. Accordingly, the alleged gift must fail.

*Spanierman v Spanierman* (67 Misc 2d 93), so strongly relied on by respondent, is not to the contrary. There plaintiff lent defendant, his son, the sum of $5,000. Defendant made three partial repayments, each in the sum of $250. Subsequently, the defendant decided to repay the balance of the loan. He tendered a check to plaintiff in the sum of $4,250 which the plaintiff returned to him stating in substance that he forgave the obligation and wanted the defendant to have the balance due as a gift. Thus, both the donative intent and a symbolic delivery were made out.

## II

Similarly, we find little merit to respondents' claim of estoppel. In order for an estoppel to exist three elements are necessary: "(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than and inconsistent with, those which the party subsequently seeks to assert; (2) intention, or at least expectation, that such conduct will be acted upon by the other party; (3) and, in some situations, knowledge, actual or constructive, of the real facts." (21 NY Jur, Estoppel, § 21.) Respondents claim that the loans were made to them by Mrs. Carr to enable them to engage in a specific business venture. Yet, the fact is that after the loans were made respondents closed their art gallery and engaged in commercial ventures other than the one specifically contemplated. Certainly, no statement by or conduct of Mrs. Carr and no representation by her that the loans

were to enable respondents to engage in a specific venture induced respondents to engage in other commercial ventures. Hence, the basis for an estoppel is missing.

Accordingly, the order of the Surrogate's Court, New York County (RENEE R. ROTH, S.), entered August 19, 1983, denying petitioner's motion for partial summary judgment should be modified on the law and the motion granted to the extent of granting partial summary judgment as to the $63,000 to petitioner and otherwise affirmed with costs.

CARRO, J. P., FEIN, MILONAS and ALEXANDER, JJ., concur..

Order, Surrogate's Court, New York County, entered on August 19, 1983, unanimously modified, on the law, and the motion granted to the extent of granting partial summary judgment in the sum of $63,000 to petitioner and otherwise affirmed. Appellants shall recover of respondents one bill of $75 costs and disbursements of this appeal.