SOUTHERN FEDERAL SAVINGS AND LOAN ASSOCIATION OF GEORGIA, Plaintiff,

v.

21–26 EAST 105TH STREET ASSOCIATES, United Development International, Inc., 104–105th Street Associates, Royal Plumbing Supply Corporation, C.V. Construction & Development, Inc., Kamco Supply Corp., "John Doe" as Executor of the Estate of Dora Frank Izsak, Investors Insurance Company of America, Department of Housing Preservation and Development, Defendants.

No. 90 Civ. 6959 (LLS).

United States District Court, S.D. New York.

Nov. 18, 1991.

On Motion for Reargument Dec. 10, 1991.

Leonard S. Elman, Berger Steingut Tarnoff & Stern, New York City, for plaintiff.

Paul H. Appel, Trott & Appel, New York City, for defendants.

## OPINION AND ORDER

STANTON, District Judge.

This diversity action arises out of a loan made for the rehabilitation of, and secured by premises located at 21–29 East 104th

Street in Manhattan (the "premises"). Plaintiff Southern Federal Savings and Loan Association of Georgia (the "Bank") made the loan, and it now moves pursuant to Fed.R.Civ.P. 56 for summary judgment (a) in its favor on notes given with the loan, (b) of foreclosure on the premises, and (c) dismissing defendants' counterclaims.

## BACKGROUND

In February 1989 the Bank agreed to lend defendants 21–26 East 105th Street Associates, 104–105th Street Associates and United Development International, Inc. (collectively "defendants") $1,850,000 in connection with the premises (the "loan"). (Joint Statement of Non–Disputed Facts ("Non–Disputed Facts") ¶ 6). Of that amount, $497,600 was to be used for renovations at the premises. (*Ibid.*) The term of the loan was from February 15, 1989 to February 15, 1990, and interest was payable on the full amount of the loan. (*Id.* ¶ 7).

As security for the loan defendants, by their principal Steven Kessner, executed two notes totaling $1,850,000 in favor of the Bank (the "notes"). (*Id.* ¶ 8). The notes each provide that interest was due monthly, and the unpaid principal and all interest was due on the maturity date of the loan. (*Id.* ¶ 10). They further provide that if any installment was not paid when due, the entire amount of the loan "shall at once become due and payable, at the option of the holder hereof. The holder hereof may exercise this option to accelerate during any default by the undersigned regardless of any prior forbearance." (*Id.* ¶ 11).

Each of the notes states that the defendants were entitled to two three-month extensions of the loan, provided that at the time of the particular extension there were no defaults on the notes, and on payment by defendants of a $4,625.20 fee for the extension plus any reasonable costs thereby incurred by the Bank. (*Id.* ¶ 13).

As further security for the loan, Mr. Kessner gave mortgages on the premises. (*Id.* ¶ 14).

As part of the loan, the parties entered into a "Building Loan Agreement" which provided $497,600 for renovations. (*Id.* ¶ 16). Of that amount, $465,000 was allocated for construction work, or "hard costs," and $32,600 for interest, or "soft costs." (*Id.* ¶ 17). Hard cost advances were to be "made to Borrower [i.e., defendants] from time to time on a progress payment basis, but not more frequently than once a month." (Building Loan Agreement ¶ 2).

To obtain construction advances, defendants were required to furnish the Bank (1) a certificate from defendants stating the amount requested and that they had paid or incurred the expenses sought, and (2) a certificate from an architect, verified by the Bank's construction consultant, stating that the amount requested was equal to the value of services performed or materials supplied or installed, that the work was completed in a good and workmanlike manner, and that the work would be completed on or before the "Completion Date" of February 15, 1990. (Non–Disputed Facts ¶ 18). The Bank was not obliged to disburse any funds if defendants were in default "under any of the documents evidencing or securing the Loan." (*Id.* ¶ 19).

The Building Loan Agreement provides:

> If Borrower shall fail to comply with all of the conditions set forth in paragraphs 2 and 3 hereof on or before the Completion Date, or if Bank shall have accelerated the maturity of the Loan prior to such compliance, Borrower shall not be entitled to receive the [hard cost] Advances (or further Advances in addition to Advances theretofore made)....

(Building Loan Agreement ¶ 5). It further provides:

> No modification or waiver of or with respect to any provision of this Agreement, or any other agreements, instruments and documents delivered pursuant hereto, nor consent to any departure by Borrower from any of the terms or conditions hereof or thereof, shall in any event be effective unless it shall be in writing and signed by Bank, and then such waiver or consent shall be effective only in

the specific instance and for the purposes for which given.

(*Id.* ¶ 6.c.).

From March to October 1989 defendants submitted certifications and requests for hard cost advances, and the Bank's construction consultant certified those amounts for payment. Each such request was honored by the bank. (*Id.* ¶ 31).

On a number of occasions in 1989, the Bank credited amounts that defendants owed for interest by deducting those amounts from undisbursed construction loan proceeds. In other words, rather than requiring that defendants send the Bank payment for interest, and then sending defendants sums then due for hard costs, the Bank made book entries showing a withdrawal of amounts due for hard costs, and then used the withdrawn amounts to credit defendants with sums they owed for interest.

Defendants assert that there were five such transactions in July, October and November. (Defendants' Statement of Disputed Facts ("Defendants' Statement") ¶ 3.g.–h.). They state that the $32,600 allocated under the Building Loan Agreement for interest was exhausted by June 1989. (*Id.* ¶ 3.e.).

Defendants assert that the Bank paid from amounts allocated for hard costs $76,438 of the $131,846 in interest they owed in 1989. (*Id.* ¶ 3.f.). They assert that three of those payments, totalling $50,225, were paid directly from undisbursed loan proceeds that were not deducted from construction draw requests. (*Id.* ¶ 3.h.). They also assert that the Bank used construction loan proceeds for escrow and inspection fees owing to the Bank, although there was no provision in the Building Loan Agreement for such payments. (*Id.* ¶ 4).

Defendants further assert that Bank representatives did not consider whether their actions were consistent with the loan documents. (Affidavit of Steven A. Kessner sworn to July 3, 1991 ("Kessner Aff.") exhibit A at 98).

Defendants initially planned to renovate 16 units at the premises. During construction, they increased the scope of the work until finally they were renovating 22 units. (*See* Defendants' Statement ¶ 6, 11.b., Kessner Aff. ¶ 5). Mr. Kessner asserts that

> In 1989 Southern Federal by its conduct made clear to defendants its intention to ignore the written loan documents and instead to use undisbursed construction funds to pay hard or soft costs as and when needed regardless of limitations and restrictions in the loan documents so as (1) to keep the loan fully current, (2) to avoid a default and (3) to permit the construction, including the additional construction, to proceed.

(*Id.* ¶ 3). He further states that "Had the bank not demonstrated an unqualified willingness to ignore the contract documents and to pay hard and soft costs as and when needed from undisbursed loan proceeds, defendant would never have increased the scope of construction." (*Id.* ¶ 5).

The Bank asserts that all payments made for interest through October 1989 had been certified (either in writing or orally) for release as hard costs (Plaintiff's Statement of Disputed Facts ¶¶ 3–4), and that it deducted interest payments from undisbursed loan proceeds in November 1989 in error (*id.* ¶ 8).

Mechanics liens were filed against the premises in December 1989 and February 1990 in the amount of $68,464.24. (Non–Disputed Facts ¶ 34). Those liens have not been discharged. The Bank asserts, and defendants do not dispute, that the presence of such liens is a default under the loan documents.

On January 10, 1990, Mr. Kessner wrote the Bank requesting a three-month extension of the loan. (Affidavit of Jonathan A. Olsoff sworn to June 18, 1991, exhibit F). He did not include the extension fee. On January 22, 1990, the Bank wrote to Mr. Kessner and demanded that defendants pay the December 1989 and January 1990 interest payments, as well as submit a plan for completing construction at the premises. (*Id.* exhibit G). The parties engaged in correspondence from January to September 1990. None of those letters refer to a

modification of the contract either by oral agreement or by the parties' conduct. (*See id.* exhibit I).

From February to May 1990, defendants sent the Bank $67,998 for amounts that the Bank asserted were due for interest. (Defendants' Statement ¶ 11.e.(2)). They assert that if the Bank continued to use the remaining undisbursed loan proceeds (which amounted to approximately $93,000) for interest payments, and if they had not been forced to pay the Bank the $67,998 for interest, they could have completed construction and obtained permanent financing for the premises. They point to the fact that in November 1990, Mr. Kessner closed on a $3,000,000 refinancing on residential property near the premises, which paid off a construction loan and accrued interest in the amount of $2,251,485.80. (Defendants' Statement ¶¶ 11.e.(3)–(4), 12).

## DISCUSSION

*The Standards for Summary Judgment*

Under Fed.R.Civ.P. 56, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989).

If a motion for summary judgment is properly supported, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). The materiality of facts in this diversity action is determined by state substantive law. *Id.* at 248, 106 S.Ct. at 2510.

### 1. Modification

Defendants assert that the parties' conduct modified the terms of the loan to provide that the Bank would use undisbursed construction funds to pay hard or soft costs as necessary to keep the loan current, to avoid a default and to permit construction, including the additional construction that defendants undertook, to proceed.

■ The Bank denies there was such a modification, and it points to the Building Loan Agreement's provision prohibiting modifications unless made in writing and signed by the Bank. (*See* Building Loan Agreement ¶ 6.c.). Such a provision is enforceable under New York General Obligation Law section 15–301(1) (McKinney 1989), which states

A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

■ "Under certain conditions, however, a written agreement which provides that it cannot be modified except by a writing, can be modified by a course of conduct or actual performance." *Seven–Up Bottling Co. (Bangkok) v. Pepsico, Inc.*, 686 F.Supp. 1015, 1022 (S.D.N.Y.1988); *see also Rosen Trust v. Rosen*, 53 A.D.2d 342, 386 N.Y.S.2d 491, 499 (4th Dep't 1976) ("any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance."), *aff'd*, 43 N.Y.2d 693, 401 N.Y.S.2d 66, 371 N.E.2d 828 (1977); *All–Year Golf, Inc. v. Products Investors Corp.*, 34 A.D.2d 246, 310 N.Y.S.2d 881, 885 (4th Dep't 1970) (same).

■ Where a contract provides that it cannot be modified except in writing, a party asserting that the contract has been modified by an oral agreement must show that there has been partial performance of the agreement to modify, which perfor-

mance is unequivocally referable to the oral modification. *See Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir.1990); *Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279, 1283 (1977).

■ There is no allegation of any verbal agreement here. Nor does the conduct alleged by defendants tend to show that an agreement had been made. Rather, defendants argue that the Bank's conduct demonstrated an "intention to ignore the written loan documents" (Kessner Aff. ¶ 3). Judge Lasker's statement in *Grandonico v. Consortium Communications Intl., Inc.,* is precisely on point here:

> [W]hile partial performance may be used to prove an oral agreement where it is alleged that an oral agreement was made, there must be an oral *agreement* to alter the written contract: Otherwise, the fact that the parties acted in a manner inconsistent with the terms of the written contract is not sufficient to alter those terms in the face of a contract provision that all alterations must be in writing.

*Grandonico v. Consortium Communications Intl., Inc.,* 566 F.Supp. 1288, 1291 (S.D.N.Y.1983). Defendants' assertion that "the Bank's conduct ... modified its agreement with defendants" (Defendants' Brief at 4) must fail because the conduct itself cannot produce a modification of the contract. Conduct can at best be evidence of "an agreement based upon consideration" between both parties to modify the existing contract. *Nassau Trust Co. v. Montrose Concrete Prod.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (1982). Defendants give no evidence of when and between which parties an agreement to modify took place; only that the Bank's "repeated decisions to ignore restrictions and limitations in the contract" somehow constituted an agreement or became one. (Defendants' Brief at 4.) Defendants' inferences taken from the Bank's actions cannot be construed as an agreement with the Bank. No modification therefore took place.

**2. Estoppel**

In defendants' second counterclaim, they contend that the Bank is estopped from foreclosing on the premises because of its conduct, which they say demonstrated "an unqualified willingness to ignore the contract documents and to pay hard and soft costs as and when needed from undisbursed loan proceeds." (Kessner Aff. ¶ 5). They assert that they relied on that conduct in increasing from 16 to 22 the number of units to be renovated.

■ "An estoppel 'rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury.'" *Dimacopoulos v. Consort Devel. Corp.,* 166 A.D.2d 631, 561 N.Y.S.2d 59, 60 (2d Dep't 1990) (quoting *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (1982)). It requires a showing that the party to be estopped intended, or at least expected, that another would act upon its conduct. *In re Estate of Carr,* 99 A.D.2d 390, 473 N.Y.S.2d 179, 182 (1st Dep't 1984). Further, the "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." *Rose,* 397 N.Y.S.2d at 927, 366 N.E.2d at 1283; *see also American Prescription Plan, Inc. v. American Postal Workers Union,* 170 A.D.2d 471, 565 N.Y.S.2d 830, 832 (2d Dep't 1991). The rationale behind estoppel is articulated in *Nassau Trust:*

> It is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.

*Nassau Trust Co. v. Montrose Concrete Prod.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (1982) (citation omitted).

■ The present question is then, taking all reasonable inferences in favor of defendants, whether a reasonable trier of fact

could find that defendants, justifiably relied on the Bank's conduct which was inconsistent with its rights under the contract and that the subsequent enforcement of those rights would work an injustice on defendants. Defendants' papers demonstrate a sufficient factual basis to find that they did rely on the Bank's crediting construction cost proceeds toward defendants' interest charges in deciding to expand their construction project from 16 to 22 units. The remaining issue is whether the Bank's conduct was such that defendants were justified in relying on the Bank's continued forbearance. Defendants say that it was the Bank's routine and consistent practice to use the construction costs to pay the interest due. The evidence, even taking all inferences in defendants' favor, does not support that claim.

Using defendants' version of the facts with regard to the interest payments on the loan (Defendants' Disputed Facts at 2, 3), the payments to escrow (Defendants' Disputed Facts at 3, 4), and bank statements issued to defendants (Defendants' Disputed Facts at 8, 9), the following chronology may be derived:

February 15, 1989—Defendants pay $6,574 interest from their own funds. (*Id.* at 2.)[1]

March 31, 1989—$15,387 interest and $3293 to escrow due. Bank pays $15,387 interest charge from allocated "soft cost" proceeds. (*Id.* at 2, 8).

April 30, 1989—$15,036 interest and $3293 to escrow due. (*Id.* at 8).

May 8, 1989—Bank pays $15,036 interest charge from allocated "soft cost" proceeds. (*Id.* at 2).

May 31, 1989—$16,046 interest and $3293 to escrow due. (*Id.* at 8).

June 23, 1989—Bank pays $2,175 interest from allocated "soft cost" proceeds, exhausting the soft cost allocation. (*Id.* at 2). $13,871 interest and $3293 to escrow (or $17,164 total) still due.[2]

June 30, 1989—New interest and escrow due, added to previous month now totals $29,504 interest and $6586 ( = 2 × 3293) escrow. (*Id.* at 9).

July 7, 1989—Bank pays "as per request" $17,163 (the amount due from May 31) from construction costs, apparently crediting it only to interest charges. (*Id.* at 2, 9).

July 26, 1989—Bank pays $12,340 interest and $6586 to escrow (representing the balance of charges due from June 30) from construction costs. (*Id.* at 3).

July 31, 1989—$16,234 interest and $3293 to escrow due. (*Id.* at 9).

August 28, 1989—Defendants pay $16,234 interest from their own funds. (*Id.* at 2).

August 31, 1989—$16,323 interest and $3293 to escrow due. (*Id.* at 9).

September 30, 1989—New interest and escrow due, added to previous month now totals $32,693 interest and $6586 escrow. (*Id.* at 9).

October 16, 20, 1989—Bank makes two interest payments totalling $32,692 and payment to escrow of $3293 from construction costs. $3293 to escrow apparently still due. (*Id.* at 3–4, 9).

October 30, 1989—$17,532 interest and $6896 to escrow due. Handwritten on statement that balance of $24,518 was paid, apparently from construction costs. (*Id.* at 9, 3–4).

November 30, 1989—$17,495 interest and $3293 to escrow due. (Total = 20,788.) (*Id.* at 9).

December 31, 1989—New interest and escrow due, added to previous month now totals $35,643 interest and $6586 escrow. $20,788 marked previously due. (*Id.* at 9).

At this point, correspondence between the Bank and defendants started, which ultimately led to the present dispute.

The chronology shows that after an initial payment by defendants, the Bank used the soft cost funds for interest payments

---

1. Defendants' submission lists "1979" as the year, but the surrounding information makes clear that "1989" was intended.

2. The Bank's statement of May 31, 1989 indicates that they may have credited the remaining $2,175 of soft costs at that time. (*See Id.* at 9).

as specified in the contract. When the soft cost funds ran out, defendants were one month in arrears on interest payments until, apparently at defendants request, the Bank used hard cost funds to bring defendants' interest charges current in July. Thereafter, defendants paid interest charges from their own funds in August. In September and October defendants again fell behind on interest due. In October the Bank made a series of payments from defendants' hard cost funds to bring the account current as of November 1. Defendants again failed to pay interest charges which came due in December and January of 1990. Defendants now argue that these facts justified their reliance on the Bank keeping payments current by using defendants' hard costs toward interest charges. No such reliance was justified.

At the time the November and December interest charges came due the Bank had twice made a series of interest payments from construction costs to bring the accounts current. Between those occasions, defendants paid interest charges from their own funds. Defendants could justifiably be confused as to the Bank's future course of action or even hope that the Bank would, for a third time, use construction costs to pay interest charges. None of the Bank's actions, however, could justify *relying* on the Bank bailing defendants out again. The Bank's two occasions of bringing defendants' interest charges current using construction costs can only be seen as two incidents of forbearance on the Bank's part. While this specific conduct is not envisioned by the agreement, the contract does state that "no failure on the part of the Bank to exercise, and no delay in exercising, any right shall operate as a waiver thereof." (Building Loan Agreement ¶ 6(d).) Nothing in the Bank's conduct warrants the inference that this clause was revoked, and it therefore leaves unjustifiable defendants' reliance on the Bank's future forbearance. Because the Bank's actions inconsistent with the Loan Agreement were not so continuous or systematic as to justify reliance on its continued forbearance, it is not estopped from enforcing its rights under the contract.

### 3. Promissory Estoppel

In defendants' third counterclaim, they assert "under the doctrine of promissory estoppel, [the Bank] is barred and precluded from denying the modification of the loan contracts and from declaring the default upon which this proceeding is based." (Verified Answer and Counterclaims ¶ 44).

■ A promissory estoppel claim must be based on a clear and unambiguous promise. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989). Here, defendants produce no evidence of such a promise, but instead rely upon the Bank's conduct in administering the loan. Thus the Bank's motion with respect to this claim is granted. *See Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227, 235–36 (S.D.N.Y.1989) (general assurances are insufficient); *see also Marine Transport Lines, Inc. v. International Org. of Masters, Mates & Pilots*, 636 F.Supp. 384, 391 (S.D.N.Y.1986).

### 4. Waiver

■ A provision in a contract stating that it cannot be modified except in writing may be waived. Under New York law such a waiver requires an intentional relinquishment of a known right. *Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 39–40 (2d Cir.1986).

■ Defendants assert that the Bank waived the conditions precedent to the extension of the maturity date of the loan. Ironically, the very evidence which defendants point to in support of their waiver argument shows that no waiver occurred. They cite loan officer and Senior Vice President, Anne Brennan's following deposition testimony:

Q At any time during the course of the administration of this loan, to your knowledge, did a concern ever arise that monies being advanced on this loan were violating the terms of the loan documents?

A No.

(Brennan Deposition at 98, Defendant's Brief at 47).

The testimony showed that no system for checking the Bank's actions for consistency with the contract terms existed and that the Bank did not consider whether its actions were consistent with the contract. Rather than showing that the Bank knew its rights and intended to waive them, defendants have shown that the Bank did not even consult the contract to determine whether it was complying with the terms. If this was sloppy practice, it does not show an intent to waive any rights.

5. Fiduciary Duty

■ Defendants assert that the Bank owed them a fiduciary duty, and that it breached that duty. While defendants in their pleading allege a breach of fiduciary duty in connection with the court's appointment of a receiver for the premises (Verified Answer and Counterclaims ¶ 56), they produce no evidence of any misconduct in that regard, and they now appear to base their claim on the Bank's administration of the loan. (*See* Defendants' Brief in Opposition to Motion for Summary Judgment at 49–50 & n. 12).

■ In general there is no fiduciary duty in a creditor-debtor relationship. *See generally National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 207 (2d Cir.1989) (citing cases). Defendants produce no facts showing that there was a relationship of trust and confidence between the parties to justify imposing fiduciary duties on the Bank.

6. Implied Covenant of Good Faith

■ Defendants correctly point out that "a covenant of good faith and fair dealing is implied in every contract governed by New York law." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir.1989). The facts as alleged by defendants, however, do not establish a breach of that covenant. The implied covenant of good faith and fair dealing "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Filner v. Shapiro*, 633 F.2d 139 (2d Cir.1980). Under the terms of the Loan Agreement defendants were not entitled to use construction cost funds to pay interest on the loan, and as noted above, the Bank's actions did not modify the agreement. Therefore defendants cannot claim to be deprived of the benefits of their contract. The fact that there was a limit to the Bank's generosity cannot be construed as bad faith.

7. Fraud

Defendants assert that the Bank "falsely professed its intention to continue its policy of cooperation," and that it fraudulently prevented defendants from obtaining financing when it stated it would act in good faith in attempting to renegotiate the loan.

■ To establish fraud, defendants must show "the five traditional elements of fraud: misrepresentation of a material fact, falsity of that representation, *scienter*, reliance and damages." *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980) (italics in original) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (Ct.App.1969)), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). Defendants point to no specific statement that is alleged to be fraudulent, or show that any such assurances were false when made. *See Paper Corp. v. Schoeller Technical Papers, Inc.*, 742 F.Supp. 808, 811 (S.D.N.Y.1990).

■ Defendants also assert that the Bank's failure to disclose the effects the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") on its administration of the loan amounted to fraud. "Nondisclosure is tantamount to an affirmative misrepresentation where a party to a transaction is duty-bound to disclose certain pertinent information.... Such duty to disclose may arise where a fiduciary or confidential relationship exists or where a party has superior knowledge not available to the other...." *Callahan v. Callahan*, 127 A.D.2d 298, 514 N.Y.S.2d 819, 821 (3d Dep't 1987) (citations omitted).

■ However, defendants produce no evidence that the Bank withheld the information with the intent to defraud defen-

dants. *See* 60 N.Y.Jur.2d *Fraud and Deceit* § 93, at 570 (1987) ("In order to recover damages in fraud and deceit based on the nondisclosure of facts, it must appear that there was an intent to deceive and defraud by such nondisclosure."); *see also DuPont v. Brady,* 646 F.Supp. 1067, 1075 (S.D.N.Y.1986), *rev'd on other grounds,* 828 F.2d 75 (2d Cir.1987). On the contrary, they offer nothing but unsupported conjecture.

### 8. Interference with Business Relations

Defendants assert that "the conduct of the bank was calculated to and did prevent the defendant [sic] from completing construction, refinancing the loan and thereby avoiding this foreclosure proceeding and the damages which have resulted." (Brief of Defendants in Opposition to Motion for Summary Judgment at 52).

■■■ A claim for interference with business relations requires a showing that the defendant interfered with relations between plaintiff and a third party either with the sole purpose of harming the plaintiff or by dishonest or unlawful means. *PPX Enter., Inc. v. Audiofidelity Enter., Inc.,* 818 F.2d 266, 269 (2d Cir.1987); *Quail Ridge Assocs. v. Chemical Bank,* 162 A.D.2d 917, 558 N.Y.S.2d 655, 658 (3d Dep't), *app. dismissed,* 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (Ct.App.1990). As stated above, there is no evidence of any such wrongful actions by the Bank.

### 9. RICO

Defendants assert that the Bank violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1988). They allege predicate acts of mail and wire fraud:

> To allege a violation of the wire or mail fraud statute, it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States wires or mails or caused a use of the mails in furtherance

of the scheme; (3) the defendants did so with the specific intent to defraud.

*Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926, 946 (S.D.N.Y.1989).

There is no evidence of a scheme to defraud in this transaction, nor, as stated above, any evidence that the Bank had a specific intent to defraud defendants.

■■ Moreover, defendants fail to present sufficient proof of a pattern of racketeering activity, a necessary element of a RICO claim. To establish a RICO pattern, it must be shown that the alleged predicate acts, "amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989) (emphasis in original); *see also United States v. Alkins,* 925 F.2d 541, 551 (2d Cir.1991). The complaining party can demonstrate a RICO pattern by showing either "closed-ended" continuity, which is a "closed period of repeated conduct," or "open-ended" continuity, which is "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902.

■■ Defendants base their RICO claim on only a single, short, narrow scheme with few victims and one goal, and there is no showing of any ongoing wrongful activity. *See Passini v. Falke–Gruppe,* 745 F.Supp. 991, 992–93 (S.D.N.Y.1990). Accordingly, they have not presented facts from which a reasonable trier of fact could find a pattern of racketeering activity, and defendants' RICO claim is dismissed.[3]

### CONCLUSION

The Bank's motion for summary judgment is granted.

### ON MOTION FOR REARGUMENT

Defendants move for reargument of plaintiff's motion for summary judgment, which was granted by opinion and order of this court dated November 18, 1991.

---

**3.** Defendants withdraw their ninth (defamation of credit) and eleventh (improper appointment of a receiver) counterclaims. (Brief of Defendants in Opposition to Motion for Summary Judgment at 52, 53).

The facts were set forth in the November 18 opinion and will not be repeated here. Defendants seek to avoid judgment of default on the loan, asserting that plaintiff Bank's conduct (advancing loan proceeds which were specified for construction costs and applying them to interest due on the loan) modified the contract, or estopped the Bank from enforcing the contract since defendants relied on the Bank continuing that conduct and undertook to renovate more units than they would have done under the contract as written.

The November 18 opinion does not, as defendants argue, have "the effect of rejecting the class of implied contracts based upon non-verbal acts." Defendants' Brief at 5. A contract can be modified by agreement, whether express or implied. Here it is conceded that there was no express agreement to modify. The actions of plaintiff do not provide a legal basis for implying an agreement, for they do not evidence even a tacit commitment on the Bank's part to continue the advances and interest applications in the future.

Concerning the defense of estoppel, the court did not question defendants' reliance, but rather its justification. For the estoppel defense to succeed, defendants' reliance must have been justified. *See Nassau Trust Co. v. Montrose Concrete Prod.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (Ct.App. 1982). The Bank's conduct inconsistent with the contract was no more than two periods of forbearance, before and between which defendants were expected to, and did pay their own interest costs. There was no legal justification for relying on the Bank's further forbearance.

The motion to reargue is denied.